SUM-100

# SUMMONS
## (CITACION JUDICIAL)

**FOR COURT USE ONLY**
**(SOLO PARA USO DE LA CORTE)**

**NOTICE TO DEFENDANT:** NEWBRIDGE RESOURCES GROUP, LLC,
**(AVISO AL DEMANDADO):** a Delaware limited liability company;
ALSHAIR FIYAZ, an individual; OSCAR CROHN, an individual; KLAUS HASBO, an individual;
JOHN CRESPO, an individual; and, DOES 1 through 25, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):**

SCOTT WOOD

**ELECTRONICALLY FILED**
**Superior Court of California**
**County of Santa Barbara**
**Darrel E. Parker, Executive Office**
**10/22/2020 12:27 PM**
**By: Sarah Sisto, Deputy**

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

| The name and address of the court is: | CASE NUMBER: (Número del Caso): |
|---|---|
| (El nombre y dirección de la corte es): Santa Barbara County Superior Court  1100 Anacapa Street  Santa Barbara, CA 93121-1107 | **20CV03487** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: (El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):

Trevor D. Large, Fauver, Large, Archbald & Spray, LLP, 820 State Street, Fourth Floor, Santa Barbara, CA 93101, 805-966-7000

| DATE: 10/22/2020 | Clerk, by | /s/ Sarah Sisto | , Deputy |
|---|---|---|---|
| (Fecha) | (Secretario) | | (Adjunto) |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010).)



[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):
3. ☐ on behalf of (specify):

   under: ☐ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☐ other (specify):
4. ☐ by personal delivery on (date)

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courts.ca.gov

Trevor D. Large, Esq. (214886); Christopher M. de la Vega, Esq. (286391)
FAUVER, LARGE, ARCHBALD & SPRAY, LLP
820 State Street, Fourth Floor, Santa Barbara, CA 93101

TELEPHONE NO.: 805-966-7000   FAX NO. (Optional): 805-966-7227
ATTORNEY FOR (Name): Plaintiff, SCOTT WOOD

**ELECTRONICALLY FILED**
**Superior Court of California**
**County of Santa Barbara**
Darrel E. Parker, Executive Officer
10/22/2020 12:27 PM
By: Sarah Sisto, Deputy

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA
STREET ADDRESS: 1100 Anacapa Street
MAILING ADDRESS: P.O. Box 21107
CITY AND ZIP CODE: Santa Barbara, CA 93121-1107
BRANCH NAME: Anacapa

CASE NAME:
SCOTT WODD v. NEWBRIDGE RESOURCES GROUP, LLC, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: 20CV03487 |
|---|---|---|
| [x] Unlimited    [ ] Limited | [ ] Counter    [ ] Joinder | |
| (Amount demanded exceeds $25,000)    (Amount demanded is $25,000) | Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: <br> DEPT.: |

Items 1–6 below must be completed (see instructions on page 2).

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [x] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition (not specified above) (43)

2. This case [ ] is   [x] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [x] monetary  b. [ ] nonmonetary; declaratory or injunctive relief  c. [x] punitive
4. Number of causes of action (specify): Seven
5. This case [ ] is   [x] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)
Date: October 22, 2020

Trevor D. Large, Esq.
(TYPE OR PRINT NAME)

▶ (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
    Medical Malpractice– Physicians & Surgeons
    Other Professional Health Care Malpractice
Other PI/PD/WD (23)
    Premises Liability (e.g., slip and fall)
    Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
    Intentional Infliction of Emotional Distress
    Negligent Infliction of Emotional Distress
    Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
    Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
    Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/ Warranty
    Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
    Auto Subrogation
    Other Coverage
Other Contract (37)
    Contractual Fraud
    Other Contract Dispute
**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court Case Matter
    Writ–Other Limited Court Case Review
Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
    Abstract of Judgment (Out of County)
    Confession of Judgment *(non-domestic relations)*
    Sister State Judgment
    Administrative Agency Award *(not unpaid taxes)*
    Petition/Certification of Entry of Judgment on Unpaid Taxes
    Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-harassment)*
    Mechanics Lien
    Other Commercial Complaint Case *(non-tort/non-complex)*
    Other Civil Complaint *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late Claim
    Other Civil Petition

**CIVIL CASE COVER SHEET**

1  Trevor D. Large (SBN: 214886)
2  Christopher M. de la Vega (SBN: 276391)
   **FAUVER, LARGE, ARCHBALD & SPRAY, LLP**
   820 State Street, 4th Floor
3  Santa Barbara, CA 93101
   Tel: (805) 966-7000
4  Fax: (805) 966-7227

5  Attorneys for Plaintiff
   Scott Wood

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
10/22/2020 12:27 PM
By: Sarah Sisto, Deputy

6

7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9           **FOR THE COUNTY OF SANTA BARBARA - ANACAPA DIVISION**

10

11  SCOTT WOOD, an individual,                 **Case No.:**  20CV03487

12              Plaintiff,                      [Assigned for All Purposes to the
                                               Honorable_____]
13       v.
                                               **COMPLAINT FOR:**
14
                                               1. **BREACH OF CONTRACT;**
15  NEWBRIDGE RESOURCES GROUP, LLC, a           2. **BREACH OF CONTRACT;**
    Delaware limited liability company; ALSHAIR  3. **DECLARATORY RELIEF;**
16  FIYAZ, an individual; OSCAR CROHN, an        4. **FRAUD – INTENTIONAL**
    individual;  KLAUS HASBO, an individual;        **MISREPRESENTATION;**
17  JOHN CRESPO, an individual; and, DOES 1     5. **MISAPPROPRIATION OF TRADE**
    through 25, inclusive,                         **SECRETS;**
18                                              6. **UNFAIR COMPETITION;**
                Defendants.                     7. **BREACH OF THE DUTY OF GOOD**
19                                                 **FAITH AND FAIR DEALING;**

20

21

22       Individual plaintiff  Scott Wood ("Plaintiff" or "Wood"), on information and belief, alleges

23  against Defendants NEWBRIDGE RESOURCES GROUP, LLC ("NewBridge"), ALSHAIR FIYAZ

24  ("Fiyaz"), OSCAR CROHN ("Crohn"), KLAUS HASBO ("Hasbo"), JOHN CRESPO ("Crespo")

25  and Does 1-25 (Collectively "Defendants") the following:

26                       **I.   PARTIES**

27       **1.**      Plaintiff  Wood resides in Santa Barbara County, California.  Further, Wood entered

28  into an employment agreement with Defendant NewBridge with a jurisdiction and venue clause in



1
**COMPLAINT**

1   Santa Barbara, California.  A true and correct copy of that Employment Agreement ("EA") is

2   attached hereto as Exhibit "A."

3       **2.**      Defendant NewBridge is a Delaware limited liability company.  NewBridge owns

4   significant oil and gas assets in Santa Barbara County, California.  NewBridge also entered into the

5   EA with Wood that required jurisdiction and venue in Santa Barbara County, California.

6   NewBridge was and/or is authorized to do business in the State of California and regularly conducts

7   business within Santa Barbara County.

8       **3.**      Defendant Fiyaz is an individual whose place of residence is unknown to Plaintiff at

9   this time. However, Fiyaz regularly conducts business in the State of California and Fiyaz was one

10  of the individuals that induced Wood to enter into the EA.

11      **4.**      Defendant Crohn is an individual who place of residence is unknown to Plaintiff at

12  this time.  However, Crohn controlled operations of NewBridge, regularly conducts business in the

13  State of California and was part of the group of individuals who induced Wood to enter into the EA.

14      **5.**      Defendant Hasbo is an individual who place of residence is unknown to Plaintiff at

15  this time.  However, Hasbo controlled the operations as Board President of NewBridge, regularly

16  conducts business in the State of California and also acted as the de-facto CEO of NewBridge.

17  Hasbo was also one of the individuals involved in inducing Wood to enter into the EA.

18      **6.**      Defendant Crespo is a resident of Houston, Texas.  He is a board member of

19  NewBridge and acted as their general counsel while conducting business in the State of California.

20  He was one of the individuals involved in inducing Wood to enter into the EA.  He is also the

21  manager of K-4 Oil, LLC, fifty percent (50%) owner of NewBridge.

22      **7.**      Plaintiff is informed and believes that each Defendant, including Does 1-25, whether

23  actually or fictitiously were acting as the principal, agent or employee of each other Defendant, and

24  in acting as such principal, agent or within the scope of such employment or agency took some part

25  in the acts or omissions hereinafter set forth by reason of which each Defendant is liable to Plaintiff

26  for the relief prayed for herein.  At all times relevant herein Defendants, and each of them, ratified

27  the unlawful conduct of the other Defendants, their agents and/or employees by failing to repudiate

28  the misconduct and by accepting the benefits of the transaction with knowledge of the wrongdoing.

FAUVER · LARGE · ARCHBALD · SPRAY

**8.**     Defendant Does 1-25, inclusive, are sued herein under fictitious names.  Their true names and capacities are unknown to Plaintiff at this time.  When their true names and capacities are ascertained, Plaintiff will amend this Complaint by inserting their true names and capacities.  Plaintiff alleges on information and belief that each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged herein and that Plaintiff's injuries and damages alleged herein were proximately caused by such Defendants.

## II.  JURISDICTION AND VENUE

**9.**     Section 11(a) of the EA states that "[w]ith respect to any claim or dispute related to or arising under this Agreement, the parties hereby consent to the exclusive jurisdiction, forum and venue of the state and federal courts (as applicable) located in Santa Barbara County, California."  Further, Defendants regularly do business in California, own property in the State of California (and the County of Santa Barbara) and have employed and do employ individuals within the State of California and the County of Santa Barbara.  Defendants have obtained the benefits of the laws of the State of California and the California labor market.  Many of the acts, as well as the course of conduct alleged herein, occurred within this County.  As herein alleged, Plaintiff has been harmed in an amount to be proven at the time of trial, but in excess of One Million Dollars ($1,000,000.00).

## III. GENERAL ALLEGATIONS

**10.**    Plaintiff Wood has been involved with the oil and gas business for most of his working life.  Over the course of his career he has owned and operated several companies and oil and gas fields.  A significant number of these fields have been in Santa Barbara County, California.  Prior to meeting the Defendants, Wood had carefully acquired and cultivated numerous oil and gas businesses and development opportunities.

**11.**    After learning about this background, and specifically the projects that Wood had cultivated, in or about August, 2018, Defendant Fiyaz approached Wood about the idea of investing in Wood's projects and jointly creating an oil and gas company.  Fiyaz claimed that his financial backing, combined with Wood's assets and industry knowledge could create a successful company.

**12.**    During these initial conversations between Wood and Fiyaz, Fiyaz promised to Wood that he would have at least One Hundred Million Dollars ($100,000,000.00) available to invest in a

3

**COMPLAINT**

1    potential oil and gas company.  Fiyaz also introduced Crohn and Hasbo to Wood.  Both had prior

2    relationships with Fiyaz and were agents of Fiyaz.

3        **13.**    At the time of these discussions, Wood already had in place his company, NewBridge

4    Resources, LLC, a Texas limited liability company.  As discussions continued, it was agreed that a

5    new entity would be created using the existing assets of NewBridge Resources, LLC (that had been

6    purchased and acquired by Wood) and additional funding from Fiyaz.

7        **14.**    Once formed, one of the key assets NewBridge was to acquire was Pacific Coast

8    Energy Company, LP ("PCEC").  The potential acquisition of PCEC was information that was the

9    intellectual property of Wood and was shared with the Defendants as part of the creation of

10   NewBridge.

11       **15.**    Similarly, Wood provided Defendants, and each of them, information about other

12   potential deals that he had access to, but were unknown to Defendants or the public at large.

13   Examples of those deals include, but are not limited to, Amplify Energy Corp. ("Amplify") and HVI

14   Cat Canyon, Inc. aka "Greka" ("HVI Cat Canyon").  These are identified in more detail in the

15   business plan attached to NewBridge's Operating Agreement, as Exhibit A ("Business Plan").

16   These business opportunities and the plans related thereto were the proprietary information of Wood

17   and shared with Defendants based upon the promises made to Wood by Defendants.  Wood had

18   cultivated these opportunities and relationships for years prior to meeting Defendants.  Had the

19   individual Defendants not illegally induced Wood to enter into agreements with them and

20   NewBridge, Wood would have pursued the opportunities through other means.

21       **16.**    Over the course of further discussion, and prior to the formation of NewBridge,

22   Defendants repeatedly informed Wood that he would be Chief Executive Officer of NewBridge,

23   once formed.  Further, Defendants informed Wood that he would have control over the day to day

24   operations of the future NewBridge.  Based on those promises and discussions, Wood continued to

25   provide his proprietary information to Defendants.

26       **17.**    Ultimately, the Defendants decided to initially pursue the purchase of PCEC.  In

27   order to achieve that acquisition the individual Defendants engaged in negotiations about the funding

28   for PCEC.  However, at the last minute, Fiyaz told Wood that they had $4 Million less than

4

**COMPLAINT**

1    previously promised would be available for the closing transaction. This caused Wood to have to

2    attempt to renegotiate the PCEC deal at the last minute due to the failed promised from Fiyaz, Crohn

3    and Hasbo. It was at this time that Fiyaz told Wood that if the PCEC deal didn't close, Fiyaz "would

4    take everything from" Wood, including NewBridge Resources. The threat of taking all of Wood's

5    intellectual property and assets continued until the formation of NewBridge and acquisition of

6    PCEC, and Wood's related intellectual property, was complete.

7         **18.**    As the Defendants attempted to close the transaction to purchase PCEC, corporate

8    documents and Wood's employment agreement with NewBridge were presented to Wood. Wood

9    did not have an opportunity for independent counsel to review or evaluate the documents presented

10   to him. In fact, his proposed employment agreement was a reduction from what was previously

11   discussed with the Defendants.

12        **19.**    However, when Wood commented to Fiyaz, Crohn, Hasbo and Crespo about the late

13   receipt of the documents, as well as the terms therein, the individual Defendants told Wood to sign

14   the documents, that they were not negotiable, and if the deal didn't close, Wood would lose

15   NewBridge Resources. Crespo, like the others, made repeated comments to Wood that the

16   documents were fine, that Wood would be taken care of as CEO, and that he needed to sign the

17   documents or suffer the consequences if a deal fell through. Again, Wood did not have independent

18   counsel representing him on the negotiation of these documents and did not have the ability to

19   consult with independent counsel at the time he was forced to sign them.

20        **20.**    Ultimately, under the duress of comments from Fiyaz and the pressure from the

21   remaining individual Defendants, Wood signed the NewBridge corporate documents, as well as the

22   EA. According to the terms of the EA and the NewBridge Operating Agreement, Wood was to

23   operate as CEO of Newbridge. In that role certain duties we delegated to Wood. Those duties, as

24   described in Exhibit B of the NewBridge Operating Agreement, attached hereto as "Exhibit B" and

25   incorporated herein. However, Wood was never allowed to perform those duties.

26        **21.**    Immediately upon the start of Wood's role as CEO, it became apparent that he was

27   not allowed to operate in his new role. He was not allowed to execute on the promises made by

28   Fiyaz and the other individual Defendants regarding the operation of NewBridge, which was the

reason he agreed to the investment from Fiyaz in the first place.  He was also prevented from developing the deals he had long pursued.  Instead, at the direction of Crohn, Fiyaz and Crespo, Hasbo acted as CEO.  Wood was routinely prevented from exercising any of the duties described in Exhibit B.  Closed door meetings about the operation of NewBridge were routinely held amongst the individual Defendants, but without Wood.  In violation of the EA and the duties described in Exhibit B, the Defendants' control of Wood was so extreme, he was prevented from making even menial decisions, such as getting a reimbursement for a car wash.  But, more importantly, the Defendants prevented him exercising any part of the Business Plan, did not allow him to collaborate with the Board of Directors (he was rarely even informed of Board meetings and when he did receive notice it was the day before), restricted his ability to engage in long term planning and generally established that he was nothing more than a powerless figurehead.  Minutes from these Board Meetings routinely did not match what occurred at the meetings that were attended by Wood.  Crespo routinely attempted to have Wood sign corporate minutes that did not reflect the meetings that Wood was allowed to attend.

22.    Instead, Crohn, Fiyaz, Hasbo and Crespo operated NewBridge, and by extension, PCEC.  They did so without any input from Wood.  As a result of their sole actions and bad faith, a lawsuit *Evergreen Capital Management, LLC v. The Bank of New York Mellon Trust Company, N.A., et al, Superior Court for the State of California, County of Los Angeles, Case Number 20STCCV26290,* was filed.  In the Complaint filed in that matter, Wood is repeatedly named as the alleged bad actor by Plaintiff  Evergreen Capital Management, LLC.  However, the actions described therein were not undertaken by Wood.  To the contrary, Wood informed Defendants that he believed their actions to be improper.  The scheme to eliminate distributions to the plaintiffs in that Action, and ultimately steal their assets by prematurely forcing the Trust to dissolve, was willfully mismanaged and concocted by Fiyaz, Crohn, Hasbo and Crespo, not Wood.  Yet, as a result of the Defendants' illegal scheme, and their attribution of that scheme to Wood, Wood has suffered harm to his reputation and his ability to engage in the oil and gas business.

23.    In addition to preventing Wood from working as he was contractually authorized to do, Defendants immediately began to attempt to replace Wood as CEO. E-mails from Crohn and

Hasbo, from as early as December 2019, detail their plan to remove Wood as CEO. Further, these e-mails and actions by Defendants indicate that Defendants solely wanted to use the intellectual property provided by Wood, and had no intention of allowing him to continue as CEO once the NewBridge agreements, including the EA, had been executed. Once they had his knowledge of the deals presented in the Business Plan, they no longer had any use for Wood. Defendants improperly took Wood's intellectual property based upon false promises, prevented him from operating as CEO, and then schemed to get rid of him.

24.     Ultimately, on June 5, 2020, Defendants terminated Wood's employment without cause. Pursuant to the EA, Wood was entitled to a severance in the amount of One Million Dollars ($1,000,000.00). In addition, Wood was to receive reimbursement for health insurance costs for twelve (12) months. In order to obtain that severance and those healthcare benefits, Wood was to provide a release agreement, as described in the EA. He did so on June 26, 2020. However, Defendants never executed the release agreement and have failed to pay any severance benefits to Wood.

25.     As a direct, foreseeable and proximate result of Defendants' actions, Plaintiff sustained general and special damages, including, but not limited to: (a) loss of income and benefits; (b) loss of earning capacity; (c) severe emotional distress; (d) impairment in the quality of life and the loss of life opportunities and (f) pre-judgment interest pursuant to Civil Code sections 3287 and 3288, as well as other provisions of law providing for pre-judgment interest; all in amounts to be proven at the time of trial.

26.     Plaintiff is informed and believes that the aforesaid acts directed toward the Plaintiff were carried out with a conscious disregard of Plaintiff's rights such as to constitute oppression, fraud or malice pursuant to Civil Code section 3294. Plaintiff is therefore entitled to punitive damages in an amount appropriate to punish and set an example of Defendants.

///
///
///
///

**COMPLAINT**

FAUVER · LARGE · ARCHBALD · SPRAY

**FIRST CAUSE OF ACTION**

**(Breach of Contract Against Defendant NewBridge and Does 1-25)**

27.    Plaintiff incorporates by reference each and every allegation previously stated herein in paragraphs 1-26, as if fully restated herein, and further alleges against Defendant NewBridge and Does 1-25 as follows:

28.    On June 5, 2020, Wood was informed by Defendants that his employment with NewBridge was terminated.  He was further informed that the termination of his employment was without cause.  According to the terms of the EA, to obtain his severance and benefits, Wood was required to submit and execute a release substantially in the form attached to the EA.  Wood executed and delivered the exact agreement attached to the EA on or about June 26, 2020. Defendants did not execute the delivered agreement and have not paid any severance amounts or benefits to Wood.

29.    Wood performed all obligations under the terms of the EA.

30.    As stated herein, Defendants breached the terms of the EA.  As a result of those breaches, Wood has suffered damages, including specific monetary damages.

**SECOND CAUSE OF ACTION**

**(Breach of Contract Against  All Defendants)**

31.    Plaintiff incorporates by reference each and every allegation previously stated herein in paragraphs 1-30, as if fully restated herein, and further alleges against Defendant NewBridge and Does 1-25 as follows:

32.    According to the terms of the EA, Wood was to have certain job duties and abilities to operate as CEO of NewBridge.  Defendants, and each of them engaged in a deliberate scheme to prevent Wood from operating as CEO pursuant to the terms of the EA and/or the Operating Agreement.

33.    Further, while preventing Wood from operating as CEO, Defendants instead engaged in unauthorized and illegal acts that led to a lawsuit being filed, naming Wood as the actor responsible for the bad acts. Defendants, not Wood, were responsible for these actions.

**34.**    Through these acts, Defendants breached the terms of the EA and the Operating Agreement.

**35.**    As a result of these breaches of contract, Wood has suffered monetary damages, including, amongst other damages, lost wages and business opportunities.

## THIRD CAUSE OF ACTION

### (Declaratory Relief - Against All Defendants)

**36.**    Plaintiff incorporates by reference each and every allegation previously stated herein in paragraphs 1-35, as if fully restated herein, and further alleges against Defendant NewBridge and Does 1-25 as follows:

**37.**    Both the EA and the NewBridge Operating Agreement discuss potential non-competition by Wood.  These clauses, to the extent they are applicable to the current situation, are contrary to California law.

**38.**    Not only were the circumstances of entering into the EA and the Operating Agreement unconscionable and under duress, there are no exceptions to California's prohibition on non-competition agreements.  Therefore, these provisions are against public policy.

**39.**    To the extent there is a dispute over these provisions, Plaintiff hereby requests a declaration from this Court that Plaintiff Wood is not prevented from engaging in competitive activities with Defendants.

## FOURTH CAUSE OF ACTION

### (Fraud – Intentional Misrepresentation – Against Defendants Fiyaz, Crohn, Hasbo and Does 1-25)

**40.**    Plaintiff incorporates by reference each and every allegation previously stated herein in paragraphs 1-39, as if fully restated herein, and further alleges against Defendant NewBridge and Does 1-25 as follows:

**41.**    Prior to the formation of NewBridge and the execution of the EA, the individual Defendants, and each of them knew that they would not keep Wood as CEO once NewBridge was formed.  Yet, they repeatedly made promises to Wood to the contrary.  They understood that Wood would not have entered into a deal with the Defendants if he understood there was a scheme to

9

**COMPLAINT**

obtain his intellectual property and remove him from involvement in NewBridge, Wood would not have entered into the EA or signed the NewBridge formation documents.

**42.**     However, Wood had no knowledge of this scheme at the time he signed the documents.   He reasonably relied upon the promises repeatedly made by the individual Defendants regarding their ability to fund his projects and to allow him to operate as CEO.

**43.**     Instead, however, Wood was forced out as CEO, lost the opportunity to pursue several of the deals he had been cultivating and had his reputation in the industry severely damaged. As a result, he has suffered harm from the intentional misrepresentations of the individual Defendants.

**44.**     The individual Defendants, and each of them intentionally misrepresented facts to Wood.  (*Garamendi v. Golden Eagle Ins. Co.* (2005) 128 C.A.4th 452, 270.)  As a result of these intentional misrepresentations, Wood has been damaged in an amount to be proven at the time of trial.

**45.**     Further, Defendants' intentional misrepresentation was willful, fraudulent and malicious and carried out with reckless disregard for Wood, justifying the award of exemplary damages against Defendants.

## FIFTH CAUSE OF ACTION

### (Misappropriation of Trade Secrets - Civil Code section 3426– Against All Defendants)

**46.**     Plaintiff incorporates by reference each and every allegation previously stated herein in paragraphs 1-45, as if fully restated herein, and further alleges against Defendant NewBridge and Does 1-25 as follows:

**47.**     Plaintiff Wood possessed proprietary information about potential oil and gas deals. This information was not publicly available and, prior to engaging with Wood, was not known to Defendants.

**48.**     Defendants improperly induced Plaintiff to enter into the EA, as well as the NewBridge Operating Agreement.  The sole purpose of this illegal inducement was to obtain Plaintiff's trade secret information and assets, which were worth in excess of Twelve Million Dollars

10
**COMPLAINT**

($12,000,000.00). Wood is still paying loans for those assets that were illegally taken from him by Defendants while Defendants are unjustly enriched.

49. Upon information and belief, Defendants have used Plaintiff's trade secrets to the disadvantage of Plaintiff, and without his permission.

50. As a result of this illegal misappropriation, Plaintiff has been damaged in an amount to be proven at trial.

51. Defendants' misappropriation of Plaintiff's trade secrets was willful, malicious and carried out with reckless disregard for Wood, justifying the award of exemplary damages against Defendants.

## SIXTH CAUSE OF ACTION

### (Unfair Competition Bus. & Prof. Code section 17200 – Against All Defendants)

52. Plaintiff incorporates by reference each and every allegation previously stated herein in paragraphs 1-51, as if fully restated herein, and further alleges against Defendant NewBridge and Does 1-25 as follows:

53. Defendants' conduct in misappropriating Plaintiff's proprietary information and breaching the terms of the EA constitutes unlawful and unfair business practices and defined in California's Unfair Competition law.

54. As a result of Defendant's unlawful and unfair business practices, Plaintiff has suffered harm because, amongst other things, Plaintiff has lost income, has lost business opportunities and has suffered harm to his reputation.

## SEVENTH CAUSE OF ACTION

### (Breach of Covenant of Good Faith and Fair Dealing NewBridge and Does 1-25)

55. Plaintiff incorporates by reference each and every allegation previously stated herein in paragraphs 1-54, as if fully restated herein, and further alleges against Defendant NewBridge and Does 1-25 as follows:

56. Wood entered into the EA under the impression that Defendants would honor the obligations and promises made in the Agreement. However, Defendants did not intend to, nor did they ever operate in good faith under the terms of the EA.

11

**COMPLAINT**

**57.** As a result of the actions described herein, Defendants, and each of them, had breached the covenant of good faith and fair dealing. As a result of the breach, Plaintiff has suffered harm in amount to be proven at the time of trial.

### JURY DEMAND

**58.** Plaintiff Wood hereby demands a jury trial on all issues so triable.

### PRAYER FOR RELIEF

Wherefore, Plaintiff Wood prays for a judgment as follows:

1. Special Damages,

2. General Damages,

3. Disgorgement and Restitution of all monies earned as a result of Defendants' unlawful acts,

4. Pre-Judgment and Post-Judgment interest,

5. Exemplary Damages,

6. A Declaration that Plaintiff is not bound by any non-competition provision, and

7. For such other costs and relief as the Court may deem just and proper.

DATED: October 22, 2020                FAUVER, LARGE, ARCHBALD & SPRAY, LLP


By: _____
    Trevor D. Large
    Christopher M. de la Vega
    Attorneys for Plaintiff
    SCOTT WOOD



12

**COMPLAINT**

# Exhibit A

EXECUTION VERSION

## EMPLOYMENT AGREEMENT

**EMPLOYMENT AGREEMENT** (this "Agreement"), dated as of September 3, 2019 (the "Effective Date"), by and between **NEWBRIDGE RESOURCES GROUP, LLC** (the "Company") and **SCOTT WOOD** (the "Executive"). All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in that certain Limited Liability Company Agreement of the Company, dated September 3, 2019 (the "Operating Agreement").

## W I T N E S S E T H:

**WHEREAS,** the Company desires to retain the services and employment of the Executive on behalf of the Company, upon the terms and conditions hereinafter set forth; and

**WHEREAS,** the Executive desires to enter into such employment with the Company, upon the terms and conditions hereinafter set forth.

**NOW, THEREFORE,** in consideration of the mutual covenants and promises contained herein and for good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto, each intending to be legally bound hereby, agree as follows:

1.      Employment.   On the terms and subject to the conditions set forth herein, the Company hereby agrees to employ the Executive, and the Executive hereby agrees to accept such employment, for the Employment Term (as defined below). The Executive warrants and represents that he will not be in breach of any obligation owed to a third party by becoming employed by or working for the Company. During the Employment Term, the Executive shall serve as Chief Executive Officer of the Company and shall report to the Board of Directors of the Company (the "Board") or such other person as from time to time may be designated by the Board, performing the normal duties and responsibilities incidental to the position of Chief Executive Officer with respect to the business of the Company and such other duties and responsibilities as the Board may assign to the Executive from time to time.

2.      Performance.   The Executive shall serve the Company faithfully and to the best of his ability and shall devote his full business time, energy, experience and talents to the business of the Company, and will not engage in any other employment activities for any direct or indirect remuneration without the written approval of the Board; provided that it shall not be a violation of this Agreement for the Executive to manage his personal investments, or to engage in or serve such civic, community, charitable, educational, or religious organizations as he may select, so long as such service does not create an actual or potential conflict of interest with, or interfere with the performance of, the Executive's duties hereunder or conflict with the Executive's covenants under Section 6 of this Agreement. Notwithstanding the foregoing, nothing in this Section 2 or otherwise in this Agreement shall prevent the Executive from (i) engaging in Future Opportunities to the full extent permitted by, and subject to the terms and conditions of, the Operating Agreement, and/or (ii) otherwise owning, solely as an investor, up to twelve and a half percent (12.5%) of the outstanding securities of any class of any publicly-traded securities of any company.

3.      Employment Term. The term of the Executive's employment under this Agreement shall be the period commencing on the Effective Date and continuing until the Date of Termination (as defined below) (such period of employment, the "Employment Term"). The Executive's

employment with the Company may be terminated at any time in accordance with terms and conditions of Section 7 and Section 8.

    4.    <u>Principal Location</u>.  The Executive's shall perform the principal duties of his employment with the Company, in approximately equal amounts, in or near Santa Barbara, California and Houston, Texas; provided that, the Executive shall travel as necessary to fulfill the duties and responsibilities of the Executive's position with the Company.

    5.    <u>Compensation and Benefits</u>.  During the Employment Term, the Company shall provide the Executive with the compensation and benefits outlined below.

    (a)    <u>Base Salary</u>.  As compensation for the Executive's services hereunder and in consideration for the Executive's other agreements hereunder, the Company shall pay the Executive a base salary, payable biweekly in roughly equal installments in accordance with the Company's standard payroll procedures, at an annual rate of one million dollars ($1,000,000) (the "<u>Base Salary</u>"), subject to annual review and upward adjustments, at the discretion of the Board, beginning on September 1, 2021.

    (b)    <u>Benefits and Insurance</u>.  The Company shall reimburse the Executive for the Executive's actual out-of-pocket costs associated with the Executive's and, if applicable, the Executive's eligible dependents', participation in an individual health and welfare insurance plan, at the dental and medical coverage levels in effect as of the Effective Date, as well as other reasonable medical expenses (including, for example, deductibles and prescription costs, but not, for example, expenses related to voluntary cosmetic medical procedures) of up to $25,000 annually, subject to the Executive submitting a request for reimbursement in accordance with the terms outlined in Section 5(f) below.

    (c)    <u>Vehicle Allowance; Fuel Reimbursement</u>.  The Company shall pay the Executive a monthly vehicle allowance in the amount of $3,000.00 (the "<u>Vehicle Allowance</u>"). The Vehicle Allowance shall be paid in accordance with the Company's standard payroll procedures.  In addition, the Company agrees to reimburse the Executive for the fuel costs incurred by the Executive when driving on Company business, subject to the Executive submitting a request for reimbursement in accordance with the terms outlined in Section 5(f) below.

    (d)    <u>Vacation</u>.  The Executive shall be paid vacation and sick time per calendar year, in accordance with the established policies of the Company and its subsidiaries as of the date-hereof for an employee with twenty (20) or more years of experience.

    (e)    <u>Club Memberships</u>.  The Company shall pay, on behalf of the Executive, the annual dues for Executive's Montecito Club and Houstonian Club memberships in a sum not to exceed one thousand eight hundred dollars ($1,800) per month, subject to the Executive submitting dues information in accordance with the terms outlined in Section 5(f) below.

    (f)    <u>Business Expenses</u>.  The Executive shall be reimbursed by the Company for all reasonable, necessary and properly documented out-of-pocket business-related expenses actually incurred by him in performing the duties of his position, so long as the Executive submits all documentation for such expenses, as required by Company policy, if any, in effect from time to time.  Any such reimbursement of expenses shall be made by the Company within thirty

(30) days of the Company's receipt of the Executive's request for reimbursement, along with any applicable receipts or other substantiation documentation.

6.    Covenants of the Executive.  The Executive acknowledges that in the course of his employment with the Company he will become familiar with the Company's trade secrets and with other confidential and proprietary information concerning the Company, and that his services are of special, unique and extraordinary value to the Company.  Therefore, the Company and the Executive mutually agree that it is in the interest of both parties for the Executive to enter into the restrictive covenants set forth in this Section 6 to, among other things, protect the legitimate business interests of the Company, and that such restrictions and covenants contained in this Section 6 are reasonable in geographical and temporal scope and in all other respects given the nature of the Executive's duties and the nature of the Company's businesses and that such restrictions and covenants do not and will not unduly impair the Executive's ability to earn a living after termination of his employment with the Company.  The Executive further acknowledges and agrees that the Company would not have entered into this Agreement but for the restrictive covenants of the Executive set forth in this Section 6, and such restrictive covenants have been made by the Executive in order to induce the Company to enter into this Agreement.  Notwithstanding anything to the contrary in this Section 6 or otherwise in this Agreement, Executive shall not be prohibited during or after the Employment Term from (i) engaging in Future Opportunities to the full extent permitted by, and subject to the terms and conditions of, the Operating Agreement, and/or (ii) otherwise owning, solely as an investor, up to twelve and one half percent (12.5%) of the outstanding securities of any class of any publicly-traded securities of any company.

(a)    Noncompetition.  During the Employment Term, the Executive shall not, directly or indirectly, own, manage, operate, control, consult with, be employed by or otherwise provide executive or managerial services of the type the Executive provides to the Company during the Employment Term to any business enterprise directly engaged in the management and operation of oil and gas producing properties (collectively, a "Competitive Business"), or participate in the ownership, management, operation or control of, or provide financing to, a Competitive Business, in each case, within the Territory.

(b)    Nonsolicitation of Customers.  During the Employment Term, the Executive shall not, directly or indirectly, on behalf, or for the benefit, of a Competitive Business, (i) solicit, call upon, or divert or actively take away from the Company, any person or entity that has obtained or contracted to obtain goods or services from the Company, or the Company is actively taking steps to solicit business from (each, a "Restricted Customer"); or (ii) attempt to solicit, call upon, divert or actively take away from the Company any such Restricted Customer; provided, that, in either case, the Executive has had business contact with such Restricted Customer.

(c)    Nonsolicitation of Employees/Contractors.  During the Employment Term and during the twelve (12) month period immediately following the Date of Termination (the "Restricted Period"), the Executive shall not, directly or indirectly, solicit or attempt to hire (as an employee or independent contractor), any person who, as of the Date of Termination, is an employee of the Company, or, during twelve (12) months immediately preceding the Date of Termination, was an employee or independent contractor of the Company, in either case, that the Executive had business contact with during the Employment Term.  Notwithstanding the

foregoing, nothing in this Section 6(c) or otherwise in this Agreement shall prevent the Executive from employing any person that initiates contact by responding to a solicitation for employment made by the Executive to the general public.

(d)     Confidential Information.     The Executive acknowledges that all information, inventions, trade secrets, know-how or other non-public, confidential or proprietary knowledge, information or data with respect to the products, services, operations, finances, business or affairs of the Company or with respect to confidential, proprietary or secret processes, methods, inventions, techniques, customers (including, without limitation, the identity of the customers of the Company and the specific nature of the services provided by the Company), employees (including, without limitation, the matters subject to this Agreement) or plans of or with respect to the Company or the terms of this Agreement (all of the foregoing collectively hereinafter referred to as, "Confidential Information") are property of the Company.  The Executive further acknowledges that the Company intends, and will make reasonable good faith efforts, to protect the Confidential Information from public disclosure.  Therefore, the Executive agrees that, except as required by law or regulation or as legally compelled by court order (provided that in such case, the Executive shall promptly notify the Company of such order, shall cooperate with the Company in attempting to obtain a protective order or to otherwise restrict such disclosure, and shall only disclose Confidential Information to the minimum extent necessary to comply with any such law regulation or order), during the Employment Term and at all times thereafter, the Executive shall not, directly or indirectly, divulge, transmit, publish, copy, distribute, furnish or otherwise disclose or make accessible any Confidential Information, or use any Confidential Information for the benefit of anyone other than the Company, unless and to the extent that the Confidential Information becomes generally known to and available for use by the general public other than as a result of the Executive's acts or omissions or such disclosure is necessary during the Employment Term and in the course of the Executive's proper performance of the duties of his employment. Executive understands that certain whistleblower laws permit Executive to communicate directly with governmental or regulatory authorities, including communications with the U.S. Securities and Exchange Commission about possible securities law violations. Executive acknowledges that he is not required to seek the Company's permission or notify the Company of any communications made in compliance with applicable whistleblower laws, and that the Company will not consider such communications to violate this or any other agreement between Executive and the Company or any Company policy by which Executive is bound.

(e)     Company Intellectual Property.  The Executive agrees to promptly disclose to the Company any and all work product, inventions, artistic works, works of authorship, designs, methods, processes, technology, patterns, techniques, data, Confidential Information, patents, trade secrets, trademarks, domain names, copyrights, and the like, and all other intellectual property relating to the business of the Company which are created, authored, composed, invented, discovered, performed, perfected, or learned by the Executive (either solely or jointly with others) during the Employment Term (collectively, together with such intellectual property as may be owned or acquired by the Company, the "Company Intellectual Property").  The Company Intellectual Property shall be the sole and absolute property of the Company.  All work performed by the Executive in authoring, composing, inventing, creating, developing or modifying Company Intellectual Property and/or other work product to which copyright protection may attach during the course of the Executive's employment with the Company shall be considered "works made for hire" to the extent permitted under applicable copyright law and will be considered the sole

4

property of the Company.  To the extent such works, work product or Company Intellectual Property are not considered "works made for hire," all right, title, and interest to such works, work product and Company Intellectual Property, including, but not limited to, all copyrights, patents, trademarks, rights of publicity, and trade secrets, is hereby assigned to the Company and the Executive agrees, at the Company's expense, to execute any documents requested by the Company at any time in relation to such assignment.  The Executive acknowledges and agrees that the Company is and will be the sole and absolute owner of all trademarks, service marks, domain names, patents, copyrights, trade dress, trade secrets, business names, rights of publicity, inventions, proprietary know-how and information of any type, whether or not in writing, and all other intellectual property used by the Company or held for use in the business of the Company, including all Company Intellectual Property. The Executive further acknowledges and agrees that any and all derivative works, developments, or improvements based on intellectual property, materials and assets subject to this Section 6 created during the Employment Term (including, without limitation, Company Intellectual Property) shall be exclusively owned by the Company. The Executive will cooperate with the Company, at no additional cost to such parties (whether during or after the Employment Term), in the confirmation, registration, protection and enforcement of the rights and property of the Company in such intellectual property, materials and assets, including, without limitation, the Company Intellectual Property.

(f)     Nondisparagement.   During the Employment Term and thereafter, the Executive shall refrain from publishing any oral or written statements about the Company  or its employees, officers, directors, products, services, customers or owners that are malicious, obscene, threatening, harassing, intimidating or discriminatory and which are designed to harm any of the foregoing.  Nothing contained in this Section 6(f) shall preclude the Executive from enforcing his rights under this Agreement or truthfully testifying in response to legal process or a governmental inquiry.

(g)     Company Property.  All Confidential Information, Company Intellectual Property, files, records, correspondence, memoranda, notes or other documents (including, without limitation, those in computer-readable form) or property relating or belonging to the Company, whether prepared by the Executive or otherwise coming into his possession or control in the course of the Employment Term, shall be deemed to be a work for hire and will be the exclusive property of the Company and shall be delivered to the Company, and not retained by the Executive (including, without limitation, any copies thereof), promptly upon request by the Company and, in any event, promptly upon the Date of Termination.  The Executive acknowledges and agrees that he has no expectation of privacy with respect to the Company's telecommunications, networking or information processing systems (including, without limitation, stored computer files, email messages and voice messages), and that the Executive's activity and any files or messages on or using any of those systems may be monitored at any time without notice.

(h)     Enforcement.  The Executive acknowledges that a breach of his covenants and agreements contained in this Section 6 would cause irreparable damage to the Company, the exact amount of which would be difficult to ascertain, and that the remedies at law for any such breach or threatened breach would be inadequate.  Accordingly, the Executive agrees that if he breaches or threatens to breach any of the covenants or agreements contained in this Section 6, in addition to any other remedy which may be available at law or in equity, the Company shall be entitled to (i) institute and prosecute proceedings in any court of competent jurisdiction for specific

performance and injunctive and other equitable relief to prevent the breach or any threatened breach thereof without bond or other security, unless required by law, and (ii) seek an equitable accounting by any court of competent jurisdiction of all profits or benefits arising out of such violation.

(i)    Scope of Covenants.  The Company and the Executive agree that they consider the restrictions and covenants contained in this Section 6 to be reasonable and necessary for the protection of the interests of the Company, but if any such restriction or covenant shall be held by any court of competent jurisdiction to be void but would be valid if deleted in part or reduced in application, such restriction or covenant shall apply in such jurisdiction with such deletion or modification as may be necessary to make it valid and enforceable. The restrictions and covenants contained in each paragraph of this Section 6 shall be construed as separate and individual restrictions and covenants and shall each be capable of being reduced in application or severed without prejudice to the other restrictions and covenants or to the remaining provisions of this Agreement.

(j)    Disclosure of Restrictive Covenants.  During the Restricted Period, the Executive agrees to notify any prospective employer or other service recipient of the existence and terms of the restrictions and covenants contained in this Section 6, which are applicable during the Restricted Period, prior to commencing employment or engagement with any such employer or service recipient.

7.    Termination of Employment.

(a)    The Company's Right to Terminate the Executive's Employment for Cause. The Company shall have the right to terminate the Executive's employment hereunder at any time for Cause (as defined below), subject to the applicable terms and conditions of Section 7 and Section 8.  For purposes of this Agreement, "Cause" shall mean the occurrence of any of the following, as determined by the Board, in good faith, based upon reasonable and objective standards: (i) an act of fraud or embezzlement, or a material act of theft, misappropriation or conversion of any property belonging to the Company; (ii) any material violation by the Executive of any federal or state laws during Executive's employment with the Company that is detrimental to the Company's business, reputation, or goodwill, (iii) the Executive's indictment, conviction of, or plea of *nolo contendere* to, any felony (or state law equivalent), or any crime involving moral turpitude that results in material injury to the Company, (iv) any breach by the Executive of any material provision of this Agreement, including Executive's covenants under Section 6; *provided, however,* that such breach remains uncured by the Executive for fifteen (15) days after the Company first provided the Executive written notice of the obligation to cure such breach, but solely to the extent that such breach is susceptible to cure; (v) the Executive's repeated failure or refusal, after written notice from the Board, to perform any lawful directive of the Board or the duties of the Executive's employment as specifically outlined in this Agreement; *provided, however*, that such breach remains uncured by the Executive for seven (7) days after the Company first provided the Executive written notice of the obligation to cure such breach; (vi) the Executive's gross negligence, willful misconduct or breach of a fiduciary duty, in each case, in the performance of the Executive's duties as an employee, officer or director of the Company; (vii) Executive has reported to work under the influence of alcohol or illegal drugs more than once and in a manner as to cause a material disruption to the business of the Company (excluding non-

excessive social drinking in connection with client entertainment or social functions where appropriate in light of the circumstances); or (viii) the Executive's failure to cooperate, if requested by the Board, with any investigation or inquiry into his or the Company's business practices, whether internal or external, including, but not limited to, the Executive's refusal to be deposed or to provide testimony or evidence at any trial, proceeding or inquiry, in each case, during his employment with the Company.

(b)    The Company's Right to Terminate the Executive's Employment Without Cause. The Company shall have the right to terminate the Executive's employment hereunder at any time without Cause, subject to the applicable terms and conditions of Section 7 and Section 8.

(c)    The Executive's Right to Resign for Good Reason. The Executive shall have the right to resign from the Executive's employment with the Company at any time for Good Reason (as defined below), subject to the applicable terms and conditions of Section 7 and Section 8. For purposes of this Agreement, "Good Reason" shall mean the occurrence of any of the following, in each case, without Executive's consent: (i) a material reduction to Executive's Base Salary; (ii) a breach by the Company of a material provision of this Agreement, (iii) a material adverse change in the Executive's title, authority, duties or responsibilities as the Chief Executive Officer of the Company; or (iv) a relocation of the Executive's principal place of employment with the Company to a geographic location that is more than one hundred (100) miles away from either of the Company's principal locations, as set forth in Section 4 of this Agreement. Notwithstanding the foregoing, no resignation by the Executive for Good Reason shall be effective unless the following conditions are satisfied: (A) the Executive provides written notice to the Board of the existence of such condition(s) or event(s) within sixty (60) days of the initial existence of the same; (B) the condition(s) or event(s) specified in such notice must remain uncorrected for forty-five (45) days following the Board's receipt of such written notice; and (C) Executive's resignation for Good Reason must occur no later than one-hundred and ten (110) days after the initial existence of the Good Reason event.

(d)    The Executive's Right to Resign Without Good Reason. The Executive shall have the right to resign from the Executive's employment with the Company at any time without Good Reason, subject to the applicable terms and conditions of Section 7 and Section 8.

(e)    Termination Due to the Executive's Death or Disability. The Executive's employment with the Company will terminate immediately upon the Executive's death, and the Company shall have the right to terminate the Executive's employment hereunder upon the Disability of the Executive, in each case, subject to the applicable terms and conditions of Section 7 and Section 8.

(f)    For purposes of this Agreement, the term "Disability" shall mean the inability of the Executive to perform the Executive's essential duties and responsibilities (even with reasonable accommodation) under this Agreement for a period of more than ninety (90) consecutive days or one hundred and eighty (180) non-consecutive days during any twelve (12) month period by reason of a mental or physical disability as determined by the Board in its reasonable discretion.

(g)     Notice of Termination. Any termination of the Executive's employment by the Company or by the Executive pursuant this Section 7 (other than termination pursuant to Section 7(e) on account of the Executive's death) shall be communicated by written notice of termination (each, a "Notice of Termination") to the other party hereto in the manner provided in Section 9. The Notice of Termination shall specify: (i) the termination provision of this Agreement relied upon; and (ii) the applicable Date of Termination.

(h)     Date of Termination. For purposes of this Agreement, the "Date of Termination" shall be:

(i)     If the Company terminates the Executive's employment for Cause, the date specified in the Company's Notice of Termination;

(ii)     If the Company terminates the Executive's employment without Cause, the date specified in the Company's Notice of Termination, which shall be no less than thirty (30) days following the date on which the Notice of Termination is delivered; *provided that*, the Company shall have the option to provide the Executive with a payment equal to the Executive's pro rata Base Salary for thirty (30) days' in lieu of providing the Executive with such thirty (30) day notice period, which shall be paid in a lump sum on the Date of Termination and for all purposes of this Agreement, the Date of Termination shall be the date on which such Notice of Termination is delivered;

(iii)     If the Executive terminates the Executive's employment for Good Reason, the date specified in the Executive's Notice of Termination;

(iv)     If the Executive terminates the Executive's employment without Good Reason, the date specified in the Executive's Notice of Termination, which shall be no less than thirty (30) days following the date on which the Notice of Termination is delivered; *provided that*, the Company shall have the option to waive all or any part of the thirty (30) day notice period by giving written notice to the Executive and provide the Executive with a payment equal to the Executive's pro rata Base Salary for the portion of the notice period so waived, which shall be paid in a lump sum on the Date of Termination and for all purposes of this Agreement, the Date of Termination shall be the date determined by the Company and specified in such written notice from the Company; and

(v)     If the Executive's employment is terminated on account of the Executive's death, the date of the Executive's death.

**(vi)**     If the Executive's employment is terminated on account of the Executive's Disability, the date specified in the Company's Notice of Termination.

8.     Effect of Termination on Compensation and Benefits.

(a)     COBRA. Regardless of the reason for the termination of the Executive's employment, to the extent the Executive participates in the Company's group health plans, if any, the Executive may be eligible to elect post-termination health benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") at the Executive's expense; *provided that*, the Executive timely elects such COBRA continuation coverage.

(b)    Compensation upon Termination by the Company for Cause or Due to the Executive's Resignation without Good Reason.  In the event the Executive's employment is terminated by the Company pursuant to Section 7(a) or the Executive resigns from the Executive's employment pursuant to Section 7(d), all of the Executive's rights and benefits provided for in this Agreement will terminate as of the Date of Termination; *provided, however*, that the Executive (or the Executive's estate, as applicable) will receive, as soon as reasonably practicable following the Date of Termination, or in such time frame as required by applicable law, a lump sum cash payment consisting of (i) any Base Salary earned, but not yet paid through the Date of Termination , (ii) any employee benefits to which the Executive is entitled upon the Date of Termination in accordance with the terms and conditions of the applicable plans of the Company, (iii) reimbursement for any unreimbursed business expenses incurred by the Executive prior to Date of Termination pursuant to Section 5(e), and (iv) payment for vacation and sick time accrued, but that remains unused, as of the Date of Termination (collectively, sub-sections (i)-(iv) are referred to as the "Accrued Amounts").

(c)    Compensation upon Termination by the Company without Cause or Due to the Executive's Resignation for Good Reason.  In the event the Executive's employment is terminated by the Company pursuant to Section 7(b) or the Executive resigns from the Executive's employment pursuant to Section 7(c), all of the Executive's rights and benefits provided for in this Agreement will terminate as of the applicable Date of Termination; *provided, however*, that the Executive will receive (i) as soon as reasonably practicable following the Date of Termination, or in such time frame as required by applicable law, a lump sum cash payment for the Accrued Amounts, and (ii) subject to Section 8(e) below, (A) a lump sum cash payment in an amount equal to twelve (12) months of Executive's Base Salary, which shall be paid no later than sixty (60) days following the Date of Termination, and (B) the Company shall continue to reimburse the Executive, on a monthly basis, for the out-of-pocket health insurance costs, in accordance with and subject to the terms and conditions of, Section 5(b), for a period of twelve (12) months following the Date of Termination.

(d)    Compensation upon Termination Due to the Executive's Death or by the Company Due to the Executive's Disability.  In the event the Executive's employment is terminated due to the Executive's death or by the Company due to the Executive's Disability, in either case, pursuant to Section 7(e), all of the Executive's rights and benefits provided for in this Agreement will terminate as of the applicable Date of Termination; *provided, however*, that the Executive will receive (i) as soon as reasonably practicable following the Date of Termination, or in such time frame as required by applicable law, a lump sum cash payment for the Accrued Amounts, and (ii) subject to Section 8(e) below, (A) a lump sum cash payment in an amount equal to six (6) months of Executive's Base Salary, which shall be paid  no later than sixty (60) days following the Date of Termination, and (B) the Company shall continue to reimburse the Executive, on a monthly basis, for the out-of-pocket health insurance costs, in accordance with and subject to the terms and conditions of, Section 5(b), for a period of six (6) months following the Date of Termination.

(e)    Release of Claims.  As a condition to receiving the benefits outlined in Section 8(c)(ii) or Section 8(d)(ii) (collectively, the "Severance Benefits"), the Executive agrees to execute and deliver to the Company on or before the Release Execution Date (as defined below)

9

and not revoke within any time provided by the Company to do so, a general release of all claims, obligations and liabilities of any kind whatsoever, that the Executive may have against the Company and its employees, officers, directors, owners and members, including, without limitation, those arising from or in connection with the Executive's employment or termination of employment with the Company or this Agreement (including, without limitation, civil rights claims), but excluding all claims to the Severance Benefits the Executive may have under this Section 8, any claims that are not waivable by law, and any claims the Executive may have arising out of or relating to the Operating Agreement and Executive's continuing rights thereunder (the "General Release"). The General Release shall be substantially in the form attached as Exhibit A, which the Company may from time to time reasonably modify to reflect any developments in applicable law and the circumstances of the Executive's separation from employment. If the General Release has not been executed and delivered and become irrevocable on or before the sixtieth (60th) day following the Date of Termination, the Severance Benefits shall not be or become due or payable. As used herein, the "Release Expiration Date" is that date that is twenty-one (21) days following the date upon which the Company delivers the General Release to the Executive (which shall occur no later than seven (7) days after the Date of Termination) or, in the event that such termination of employment is "in connection with an exit incentive or other employment termination program" (as such phrase is defined in the Age Discrimination in Employment Act of 1967), the date that is forty-five (45) days following such delivery date.

9.    Notices.    All notices, requests, demands, claims, consents and other communications which are required, permitted or otherwise delivered hereunder shall in every case be in writing and shall be deemed to have been properly delivered if: (a) delivered in person, (b) sent by registered or certified mail, in all such cases with first class postage prepaid, return receipt requested, or (c) delivered by a recognized overnight courier service, in each case, to the applicable party and addressed as set forth below:

If to the Company:

NewBridge Resources Group, LLC
333 Clay Street, Suite 4400
Houston, Texas 77002
Attention: Klaus Hasbo

If to Executive:

At the Executive's residence address as maintained by the Company in the regular course of its business for payroll purposes.

or to such other address as shall be furnished in writing by either party to the other party; *provided that* such notice or change in address shall be effective only when actually received by the other party. Date of service of any such notices or other communications shall be: (i) the date such notice is personally delivered, (ii) three days after the date of mailing if sent by certified or

registered mail, or (iii) one business day after date of delivery to the overnight courier if sent by overnight courier.

10.   <u>Section 409A</u>.

(a)   Notwithstanding any provision of this Agreement to the contrary, all provisions of this Agreement are intended to comply with Section 409A of the Internal Revenue Code of 1986 (the "<u>Code</u>"), and the applicable Treasury regulations and administrative guidance issued thereunder (collectively, "<u>Section 409A</u>") or an exemption therefrom and shall be construed and administered in accordance with such intent. Any payments under this Agreement that may be excluded from Section 409A either as separation pay due to an involuntary separation from service or as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each installment payment provided under this Agreement shall be treated as a separate payment. Any payments to be made under this Agreement upon a termination of Executive's employment shall only be made if such termination of employment constitutes a "separation from service" under Section 409A.

(b)   To the extent that any right to reimbursement of expenses or payment of any benefit in-kind under this Agreement constitutes nonqualified deferred compensation (within the meaning of Section 409A), (i) any such expense reimbursement shall be made by the Company no later than the last day of Executive's taxable year following the taxable year in which such expense was incurred by Executive, (ii) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, and (iii) the amount of expenses eligible for reimbursement or in-kind benefits provided during any taxable year shall not affect the expenses eligible for reimbursement or in-kind benefits to be provided in any other taxable year; *provided*, that the foregoing clause shall not be violated with regard to expenses reimbursed under any arrangement covered by Section 105(b) of the Code solely because such expenses are subject to a limit related to the period in which the arrangement is in effect.

(c)   Notwithstanding any provision in this Agreement to the contrary, if any payment or benefit provided for herein would be subject to additional taxes and interest under Section 409A if the Executive's receipt of such payment or benefit is not delayed until the earlier of the date of the Executive's death or the date that is six (6) months after the Date of Termination (such date, the "<u>Section 409A Payment Date</u>"), then such payment or benefit shall not be provided to the Executive (or the Executive's estate, if applicable) until the Section 409A Payment Date. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this Agreement are exempt from, or compliant with, Section 409A and in no event shall the Company be liable for all or any portion of any taxes, penalties, interest or other expenses that may be incurred by Executive on account of non-compliance with Section 409A.

11.   <u>General</u>.

(a)   <u>Governing Law; Forum</u>.   This Agreement and the legal relations thus created between the parties hereto shall be governed by and construed in accordance with, the internal laws of the State of California, without giving effect to any choice of law or conflict of

law provision or rule (whether of the State of California or any other jurisdiction) that would cause the application of the law of any jurisdiction other than the State of California. With respect to any claim or dispute related to or arising under this Agreement, the parties hereby consent to the exclusive jurisdiction, forum and venue of the state and federal courts (as applicable) located in Santa Barbara County, California.

(b)    Construction and Severability. Whenever possible, each provision of this Agreement shall be construed and interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by, or invalid, illegal or unenforceable in any respect under, any applicable law or rule in any jurisdiction, such prohibition, invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other jurisdiction, and the parties undertake to implement all efforts which are necessary, desirable and sufficient to amend, supplement or substitute all and any such prohibited, invalid, illegal or unenforceable provisions with enforceable and valid provisions in such jurisdiction which would produce as nearly as may be possible the result previously intended by the parties without renegotiation of any material terms and conditions stipulated herein.

(c)    Cooperation. During the Employment Period and thereafter during the Restricted Period, the Executive shall cooperate with the Company and be reasonably available to the Company with respect to business-related matters that occur during the Executive's employment period with the Company and in which the Executive was involved or about which the Executive has personal knowledge, whether such matters are legal, regulatory or otherwise (including, without limitation, the Executive appearing at the Company's request to give testimony without requiring service of a subpoena or other legal process, volunteering to the Company all pertinent information and turning over to the Company all relevant documents which are or may come into the Executive's possession); *provided, however,* that to the extent such cooperation is required during the Restricted Period, the Company shall make reasonable efforts to minimize disruption of the Executive's other activities. As a condition to the Executive's cooperation obligations under this Section 11(c), the Company shall pay or reimburse the Executive for all travel and other reasonable out of pocket expenses incurred by the Executive in complying with his obligations under this Section 11(c).

(d)    Successors and Assigns. Except as otherwise stated in this Section 11(d), this Agreement shall bind and inure to the benefit of and be enforceable by the Company and its successors and assigns and the Executive and the Executive's heirs, executors, administrators, and successors. The services provided by the Executive under this Agreement are of a personal nature, and rights and obligations of the Executive under this Agreement shall not be assignable or delegable, except for any death payments otherwise due the Executive, which shall be payable to the estate of the Executive; *provided that* the Company may assign, with the prior written consent of the Executive, this Agreement to, and all rights hereunder shall inure to the benefit of, any subsidiary or affiliate of the Company or any person, firm or corporation resulting from the reorganization of the Company or succeeding to the business or assets of the Company by purchase, merger, consolidation or otherwise; and *provided further that* in the event of the Executive's death, any unpaid amount due to the Executive under this Agreement shall be paid to his estate. The Company may not assign this Agreement without the Executive's consent.

(e)    <u>Executive's Representations</u>.    The Executive hereby represents and warrants to the Company that: (i) the execution, delivery and performance of this Agreement by the Executive do not and shall not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which the Executive is a party or by which the Executive is bound; (ii) the Executive is not a party to or bound by any employment agreement, noncompetition or nonsolicitation agreement or confidentiality agreement with any other person or entity besides the Company; and (iii) upon the execution and delivery of this Agreement by the Company, this Agreement shall be the valid and binding obligation of the Executive, enforceable in accordance with its terms.    **THE EXECUTIVE HEREBY ACKNOWLEDGES AND REPRESENTS THAT THE EXECUTIVE HAS CONSULTED WITH INDEPENDENT LEGAL COUNSEL REGARDING THE EXECUTIVE'S RIGHTS AND OBLIGATIONS UNDER THIS AGREEMENT, TO THE EXTENT DETERMINED NECESSARY OR APPROPRIATE BY THE EXECUTIVE, AND THAT THE EXECUTIVE FULLY UNDERSTANDS THE TERMS AND CONDITIONS CONTAINED HEREIN.**

(f)    <u>Compliance with Rules and Policies</u>.  The Executive agrees to perform the duties of his employment with the Company in (i) accordance with any material policies, procedures and rules established, in writing, by the Company and the Board, which are applicable to the Executive's employment duties and made known to Executive, and (ii) in compliance with all material laws and regulations that are generally applicable to the Company and its employees, directors and officers; provided, however, that the Executive's negligent failure to comply with any such Company policy, procedure, or rule or law or regulation shall not be considered a material breach of this Agreement giving rise to Cause for termination under this Agreement.

(g)    <u>Withholding Taxes</u>. All amounts payable hereunder shall be subject to the withholding of all applicable taxes and deductions required by any applicable law.

(h)    <u>Entire Agreement</u>. This Agreement and the Operating Agreement constitute the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and terminates and supersedes any and all prior agreements, understandings and representations, whether written or oral, by or between the parties hereto or their affiliates which may have related to the subject matter hereof in any way. Notwithstanding any provision of this Agreement to the contrary, neither the reassignment of the Executive due to a reorganization or an internal restructuring of the Company nor a change in the title of the Executive's supervisor shall constitute a modification or a material breach of this Agreement; provided, however, that to the extent any such reassignment or change otherwise qualifies as Good Reason, this provision does not prevent, limit or otherwise restrict Executive from Good Reason for terminating this Agreement on that basis.

(i)    <u>Duration</u>.    Notwithstanding the Employment Term hereunder, this Agreement shall continue for so long as any obligations remain under this Agreement.

(j)    <u>Survival</u>. The covenants set forth in Sections 6 and 11(c) of this Agreement shall survive and shall continue to be binding upon the Executive notwithstanding the termination of this Agreement for any reason whatsoever.

(k)    Amendment and Waiver.    The provisions of this Agreement may be amended or waived only with the prior written consent of the Company and the Executive, and no course of conduct or course of dealing or failure or delay by any party hereto in enforcing or exercising any of the provisions of this Agreement (including, without limitation, the Company's right to terminate the Employment Term for Cause) shall affect the validity, binding effect or enforceability of this Agreement or be deemed to be an implied waiver of any similar or dissimilar requirement, provision or condition of this Agreement at the same or any prior or subsequent time. Pursuit by either party of any available remedy, either in law or equity, or any action of any kind, does not constitute waiver of any other remedy or action.    Such remedies and actions are cumulative and not exclusive.

(l)    Counterparts.    This Agreement may be executed in two or more counterparts, all of which taken together shall constitute one instrument.

(m)    Section References.    Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.    The words Section and paragraph herein shall refer to provisions of this Agreement unless expressly indicated otherwise.

(n)    No Strict Construction.    The parties hereto have participated jointly in the negotiation and drafting of this Agreement.    In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring either party hereto by virtue of the authorship of any of the provisions of this Agreement.

(o)    Time of the Essence; Computation of Time.    Time is of the essence for each and every provision of this Agreement.    Whenever the last day for the exercise of any privilege or the discharge of any duty hereunder shall fall upon a Saturday, Sunday, or any date on which banks in Houston, Texas are authorized to be closed, the party having such privilege or duty may exercise such privilege or discharge such duty on the next succeeding day which is a regular business day.

(p)    No Third Party Beneficiaries.    Nothing in this Agreement, express or implied, is intended or shall be construed to give any person other than the parties to this Agreement and their respective heirs, executors, administrators, successors or permitted assigns any legal or equitable right, remedy or claim under or in respect of any agreement or any provision contained herein.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound, have hereunto executed this Agreement as of the day and year first written above.

COMPANY:

NEWBRIDGE RESOURCES GROUP, LLC

By: _____

Name: _____ Klas Hesbo _____

Title: _____

Date: _____ 3/9/2019 _____

EXECUTIVE:

By: Scott Wood _____

Date: _____

[Signature Page to Employment Agreement]

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound, have hereunto executed this Agreement as of the day and year first written above.

COMPANY:

NEWBRIDGE RESOURCES GROUP, LLC

By: _____

Name: 4Klaus Hesbo

Title: Directer

Date: _____


EXECUTIVE:

By:  Scott Wood

Date: _____

## EXHIBIT A
## FORM OF RELEASE AGREEMENT

This **GENERAL RELEASE OF CLAIMS** (the "Agreement") is entered into by **NEWBRIDGE RESOURCES GROUP, LLC** (the "Company") and **SCOTT WOOD** (the "Executive"). The Executive and the Company may sometimes be referred to individually as "**Party**," or collectively as the "**Parties**." Capitalized terms not defined herein have the meanings given to them in the Employment Agreement.

## RECITALS

WHEREAS, the Parties entered into an Employment Agreement effective as of August [__], 2019 (the "Employment Agreement"); and

WHEREAS, pursuant to Section 7 and Section 8 of the Employment Agreement, the Executive is entitled to receive certain Severance Benefits in exchange for, among other things, Executive's execution of this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each of the Parties, the Company and Executive, intending to be legally bound, hereby incorporate the recitals above herein and agree as follows:

1.    **General Release of Claims**.

(a)    In consideration of Executive's receipt of the Severance Benefits (as defined in the Employment Agreement) and the Company's promises in this Agreement, Executive hereby forever releases, discharges and acquits the Company and its respective past, present and future subsidiaries, affiliates, stockholders, members, partners, directors, officers, managers, insurers, executives, agents, attorneys, heirs, predecessors, successors and representatives in their personal and representative capacities, as well as all employee benefit plans maintained by any of the foregoing entities and all fiduciaries and administrators of any such plans, in their personal and representative capacities (collectively, the "**Company Parties**"), from liability for, and Executive hereby waives, any and all claims, damages, or causes of action of any kind related to Executive's employment with the Company, the termination of such employment, and any other acts or omissions related to any matter occurring or existing on or prior to the Signing Date, including (i) any alleged violation through such date of any federal, state or local anti-discrimination or anti-retaliation law; (ii) any public policy, contract, tort, or common law claim or claim for fiduciary duty or breach thereof or claim for fraud or misrepresentation or fraud of any kind; (iii) any allegation for costs, fees, or other expenses including attorneys' fees incurred in, or with respect to, a Released Claim (as defined below); (iv) any and all rights, benefits or claims Executive may have under any retention, change in control, bonus or severance plan or policy of any Company Party or any retention, change in control, bonus or severance-related agreement that Executive may have or have had with the Company other than the rights to the Severance Benefits described herein; (v) any and all rights, benefits or claims Executive may have under any employment contract (including the Employment Agreement), other than Executive's rights to the Severance Benefits, rights to compensation or any other entitlements under the Employment Agreement that

16

arise following the Date of Termination (as defined in the Employment Agreement) and are intended to survive Executive's termination of employment) or incentive compensation plan; and (v) any claim for compensation or benefits of any kind not expressly set forth in this Agreement (collectively, the "**Released Claims**"). This Agreement is not intended to indicate that any such claims exist or that, if they do exist, they are meritorious. Rather, Executive is simply agreeing that, in exchange for the Severance Benefits (and any portion thereof), any and all potential claims of this nature that Executive may have against the Company Parties, regardless of whether they actually exist, are expressly settled, compromised and waived. **THIS RELEASE INCLUDES MATTERS ATTRIBUTABLE TO THE SOLE OR PARTIAL NEGLIGENCE (WHETHER GROSS OR SIMPLE) OR OTHER FAULT, INCLUDING STRICT LIABILITY, OF ANY OF THE COMPANY PARTIES.**

(b)    In no event shall the Released Claims include (i) any claim that first arises after the Signing Date, (ii) any claim to vested benefits under an employee benefit plan, (iii) any claim arising out of future rights with respect to vested equity or equity incentives, (iv) any claim arising out of or related to Executive's continuing rights under the Operating Agreement, or (v) any pending or future claim with respect to: (A) Executive's rights under any directors & officers liability insurance policies then in effect, or (B) indemnification (including advancement of expenses) or contribution by the Company or any of its affiliates pursuant to contract or applicable law.

(c)    Notwithstanding this general release of liability, nothing in this Agreement prevents Executive from filing any non-legally waivable claim (including a challenge to the validity of this Agreement) with the Equal Employment Opportunity Commission, National Labor Relations Board, Occupational Safety and Health Administration, Securities and Exchange Commission, the Financial Industry Regulatory Authority (FINRA), or any other federal, state, or local governmental agency, authority, or commission (each, a "**Governmental Agency**") or participating in any investigation or proceeding conducted by any Governmental Agency. Executive understands that this Agreement does not limit Executive's ability to communicate with any Governmental Agency or otherwise participate in any investigation or proceeding that may be conducted by any Governmental Agency (including by providing documents or other information to a Governmental Agency) without notice to the Company or any other Company Party. This Agreement does not limit Executive's right to receive an award from a Governmental Agency for information provided to a Governmental Agency.

2.    **Representations About Claims.** Executive hereby represents and warrants that, as of the Signing Date, Executive has not filed any claims, complaints, charges, actions, or lawsuits of any kind against any of the Company Parties with any Governmental Agency or with any state or federal court or arbitrator for or with respect to a matter, claim, or incident that occurred or arose out of one or more occurrences that took place on or prior to the Signing Date. Executive hereby further represents and warrants that Executive has made no assignment, sale, delivery, transfer or conveyance of any rights Executive has asserted or may have against any of the Company Parties with respect to any Released Claim. Executive agrees not to bring or join any lawsuit against any of the Company Parties in any court relating to any of the Released Claims.

3.    **Executive's Acknowledgments.** By executing and delivering this Agreement, Executive expressly acknowledges that:

(a)    This Agreement is written in a manner calculated to be understood by Executive and that he in fact understands the terms, conditions, and effects of this Agreement;

(b)    This Agreement refers to, among others, rights or claims arising under the Age Discrimination in Employment Act and Older Workers Benefit Protection Act;

(c)    Executive has carefully read this Agreement and has had sufficient time (and at least ___ days) to consider this Agreement before signing it and delivering it to the Company (the "Consideration Period").  Executive does not have to wait until the end of the Consideration Period to accept this Agreement, but Executive acknowledges that any decision to sign this Agreement before the Consideration Period expires is made voluntarily, and not because of any fraud or coercion or improper conduct by any Company Party.  If the Agreement is not signed by Executive within the Consideration Period, it is automatically revoked and is null and void;

(d)    Executive has been advised, and hereby is advised in writing, to discuss this Agreement with an attorney of Executive's choice and Executive has had adequate opportunity to do so prior to executing this Agreement;

(e)    Executive fully understands the final and binding effect of this Agreement; the only promises made to Executive to sign this Agreement are those stated herein; and Executive is signing this Agreement knowingly, voluntarily and of Executive's own free will, and understands and agrees to each of the terms of this Agreement;

(f)    The only matters relied upon by Executive and causing Executive to sign this Agreement are the provisions set forth in writing within the four corners of this Agreement;

(g)    Executive would not otherwise have been entitled to the Severance Benefits, or any portion thereof, but for Executive's agreement to be bound by the terms of this Agreement; and

(h)    no Company Party has provided any tax or legal advice regarding this Agreement and Executive has had the opportunity to receive sufficient tax and legal advice from advisors of Executive's own choosing such that Executive enters into this Agreement with full understanding of the tax and legal implications thereof.

4.    **Third-Party Beneficiaries.**  Executive expressly acknowledges and agrees that each Company Party that is not a signatory to this Agreement shall be a third-party beneficiary this Agreement and Executive's promises and acknowledgements herein.

5.    **Revocation Right.**  Executive may revoke this Agreement within the seven (7) day period beginning on the Signing Date (such seven-day period being referred to herein as the "Revocation Period").  To be effective, the revocation must be in writing signed by Executive and must be received by _____, at _____ before 11:59 p.m., central time, on the last day of the Revocation Period. This Agreement shall not become final and enforceable and

Executive shall not receive the Severance Benefits unless and until the Revocation Period has expired and Executive has not revoked this Agreement (the "Effective Date").

6.    **Governing Law**; Forum.  This Agreement and the legal relations thus created between the Parties hereto shall be governed by and construed in accordance with, the internal laws of the State of California, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of California or any other jurisdiction) that would cause the application of the law of any jurisdiction other than the State of California.  With respect to any claim or dispute related to or arising under this Agreement, the Parties hereby consent to the exclusive jurisdiction, forum and venue of the state and federal courts (as applicable) located in Santa Barbara, California.

7.    **Construction and Severability**.  Whenever possible, each provision of this Agreement shall be construed and interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by, or invalid, illegal or unenforceable in any respect under, any applicable law or rule in any jurisdiction, such prohibition, invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other jurisdiction, and the Parties undertake to implement all efforts which are necessary, desirable and sufficient to amend, supplement or substitute all and any such prohibited, invalid, illegal or unenforceable provisions with enforceable and valid provisions in such jurisdiction which would produce as nearly as may be possible the result previously intended by the Parties without renegotiation of any material terms and conditions stipulated herein.

9.    **Amendment and Waiver**.  The provisions of this Agreement may be amended or waived only with the prior written consent of the Company and the Executive, and no course of conduct or course of dealing or failure or delay by any Party hereto in enforcing or exercising any of the provisions of this Agreement shall affect the validity, binding effect or enforceability of this Agreement or be deemed to be an implied waiver of any similar or dissimilar requirement, provision or condition of this Agreement at the same or any prior or subsequent time.  Pursuit by either Party of any available remedy, either in law or equity, or any action of any kind, does not constitute waiver of any other remedy or action.  Such remedies and actions are cumulative and not exclusive.

10.    **Counterparts**.  This Agreement may be executed in two or more counterparts, all of which taken together shall constitute one instrument.

11.    **Section References**.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.  The words Section and paragraph herein shall refer to provisions of this Agreement unless expressly indicated otherwise.

*[Signature Page Follows]*

**IN WITNESS WHEREOF,** Executive has executed this Agreement as of the date set forth below, effective for all purposes as provided above.

**COMPANY:**                                    **EXECUTIVE:**

NEWBRIDGE RESOURCES GROUP, LLC

By:_____          By:_____
Name:_____          Name:_____
Title:_____          Date:_____
Date:_____

20

# Exhibit B

# EXHIBIT B

## DELEGATING RESOLUTION

DELEGATING RESOLUTION

RESOLUTION OF THE BOARD OF MANAGERS
OF NEWBRIDGE RESOURCES GROUP, LLC (THE "COMPANY")
DELEGATING CERTAIN AUTHORITY TO
THE CHIEF EXECUTIVE OFFICER OF THE COMPANY

WHEREAS, pursuant to Section 7.1(a) of the Company's Limited Liability Company Agreement (the "LLC Agreement"), the Board of Managers (the "Board") has the sole and exclusive right to manage and control the business and affairs of the Company and possess all rights and powers of a "manager" of a limited liability company under the Delaware Limited Liability Company Act; and

WHEREAS, under Section 7.1(b) of the LLC Agreement, the Board has the power and authority to delegate certain rights and powers vested in the Board pursuant Section 7.1(a) of the LLC Agreement to Officers, agents and employees of the Company,

WHEREAS, pursuant to Section 7.1(b) and Section 7.6(a) of the LLC Agreement, the Board has agreed to delegate to the Chief Executive Officer of the Company the day-to-day authority to manage the Company or any of its Subsidiaries consistent with the terms of this Delegating Resolution;

WHEREAS, the Board now wishes to adopt this resolution as the Delegating Resolution as set forth in Section 7.6(a) of the LLC Agreement and grant and empower the Chief Executive Officer with the right, power and ability to conduct the day-to-day business of the Company as set forth herein; and

WHEREAS, for the avoidance of doubt, nothing in these Delegating Resolutions shall be deemed a standing directive of the Board for purposes of determining "Cause" as defined in the Chief Executive Officer's Employment Agreement simply by their mere listing herein.

**NOW, THEREFORE, BE IT RESOLVED** by the Board:

1.    The Board delegates to the Chief Executive Officer, the following authority in the day-to-day management of the Company:

   a.   to negotiate, execute, amend contracts or agreements that do not exceed $100,000 in value, or which can be terminated by the Company or any Subsidiary (as defined in the LLC Agreement) upon notice of 30 days or less without premium or penalty;

   b.   to undertake any and all actions and expenditures as contemplated and approved in the Company's then current Business Plan (as defined in the LLC Agreement) and annual budget as adopted by the Board from time to time;

   c.   to incur individual expenditures in furtherance of the business of the Company or any subsidiary not otherwise contemplated in the then current Business Plan and annual budget as adopted by the Board from time to time so long as such expenditures do not exceed $25,000 individually or $100,000 in the aggregate;

d.  to hire and discharge employees of the Company or any Subsidiary except to the extent such employees are officers of the Company (e.g., Chief Financial Officer, Chief Operating Officer);

e.  to pay, collect, compromise, litigate, arbitrate or otherwise adjust or settle any and all other claims or demands of or against the Company or any Subsidiary or to hold reserves against the payment of contingent liabilities, where the amount the Company or any Subsidiary may recover or might be obligated to pay, as applicable, does not exceed $50,000 individually or $100,000 in the aggregate during any fiscal year;

f.  to collaborate with the Board to determine the Company's values, mission, vision and short- and long-term goals;

g.  to oversee all operational departments, safety, customer service and security functions of the Company and its Subsidiaries;

h.  to maintain a safe work environment, including material compliance with OSHA and other related safety guidelines, and, when applicable, conduct thorough accident investigations with a focus on upon any future preventive measures, and implementation of any such necessary measures;

i.  to work to maximize the long term return on invested capital within the business of the Company and its Subsidiaries;

j.  together with the Chief Financial Officer, to develop the annual budget, Business Plan and growth strategies of the Company and its Subsidiaries and elevate the same for approval by the Board;

k.  to provide general oversight and manage the day-to-day operations and manage the Company's compliance with legal and regulatory requirements;

l.  to manage relationships with outside stakeholders including service providers, government agencies, vendors and local representatives;

m.  to work, along with other senior management, in developing a strategy to acquire new revenue streams/business assets for the Company and its Subsidiaries, and maintain business relationships with clients;

n.  to work in collaboration with the Chief Financial Officer to develop capital planning recommendations for the Company and its Subsidiaries;

o.  to provide the Board with any information in his possession that is necessary to properly exercise the Board's responsibilities;

p.  to plan and set transparent goals and objectives for the Company's workforce, and to properly train and manage the workforce; and

q.  to take reasonable efforts to maintain and protect the Company's assets through adherence to the Company's maintenance management and operating guidelines.

The delegation of authority is hereby approved by the adoption of this Resolution.

**PASSED AND ADOPTED** by the Board by the following vote:

| Director | Vote | Signature |
|---|---|---|
| Klaus: Hasio C | In favor | |
| Wood: | In favor | |
| Nicholson: | In favor | |
| Warren: | In favor | |
| Crespo: | In favor | |

The delegation of authority is hereby approved by the adoption of this Resolution.

**PASSED AND ADOPTED** by the Board by the following vote:

| Director | Vote | Signature |
|----------|------|-----------|
| Hasbo : | In favor | |
| Wood: | In favor | |
| _____ : | In favor | |
| _____ : | In favor | |
| _____ : | In favor | |

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(NAME AND ADDRESS)*:     TELEPHONE NO.:<br>Trevor D. Large, Esq. (214886); Christopher M. de la Vega, Esq. (286391)<br>FAUVER, LARGE, ARCHBALD & SPRAY, LLP<br>820 State Street, Fourth Floor, Santa Barbara, CA 93101 | FOR COURT USE ONLY |
|---|---|
| ATTORNEY FOR *(NAME)*:  Plaintiff, SCOTT WOOD | **ELECTRONICALLY FILED**<br>Superior Court of California<br>County of Santa Barbara |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA

| ☒ Santa Barbara–Anacapa<br>1100 Anacapa Street<br>Santa Barbara, CA 93101 | ☐ Santa Maria-Cook<br>312-C East Cook Street<br>Santa Maria, CA 93454 | ☐ Lompoc Division<br>115 Civic Center Plaza<br>Lompoc, CA 93436 | Darrel E. Parker, Executive Officer<br>10/22/2020 12:27 PM<br>By: Sarah Sisto, Deputy |
|---|---|---|---|

PLAINTIFF:  SCOTT WOOD

DEFENDANT: NEWBRIDGE RESOURCES GROUP, LLC, et al.

| **CIVIL CASE COVER SHEET ADDENDUM** | CASE NUMBER:<br>**20CV03487** |
|---|---|

Santa Barbara County Superior Court Local Rule, rule 201 divides Santa Barbara County geographically into two separate regions referred to as "South County" and "North County," the boundaries of which are more particularly defined in rule 201. "South County" includes the cities of Carpinteria, Santa Barbara, and Goleta; "North County" includes the cities of Santa Maria, Lompoc, Buellton and Solvang. A map depicting this geographical division is contained in Appendix 1 to the local rules.

Local Rule 203 provides: "When, under California law, 'North County' would be a 'proper county' for venue purposes, all filings for such matters shall be in the appropriate division of the Clerk's office in North County. All other filings shall be made in the Clerk's office in the appropriate division of the Court in South County. The title of the Court required to be placed on the first page of documents pursuant to CRC 2.111 includes the name of the appropriate Court division."

A plaintiff filing a new complaint or petition is required by Local Rule 1310 to complete and file this Civil Case Cover Sheet Addendum to state the basis for filing in North County or South County.

The undersigned represents to the Court:

This action is filed in  ☐ North County  ☒ South County  because venue is proper in this region for the following reason(s):

☐ A defendant resides or has its principal place of business in this region at: _____

_____

☒ The personal injury, damage to property, or breach of contract that is claimed in the complaint occurred in this region at: Employment agreement/contract requires venue in Santa Barbara, California. _____

☐ There is a related case filed with the court in this region (e.g., the related personal injury action to a petition to transfer structured settlement payments) [identify case, including case number]: _____

_____

☐ Venue is otherwise proper in this region because [explain]: _____

_____

Dated:  October 22, 2020 _____

_____
Signature of Plaintiff or Plaintiff's Counsel

    CIVIL CASE COVER SHEET ADDENDUM

Luke would fly to visit his father. The time traveling to the airport, the flight time, and the time traveling to his father's home was approximately four hours of travel time on both Fridays and Sundays also.

Luke has mentioned that although he enjoys visiting with his father, the amount of time is "too much." This conversation has typically occurred as time gets closer to the summer visitation. This June we rented a cabin on a lake prior to Luke leaving to visit his Father for the summer. The family members and close friends that were present were concerned about Luke's anxiety over leaving for the entire summer.

Lastly, due to COVID-19, I have recently had a significant change of circumstance in that I am no longer employed with my former employer, Delta Air Lines, of 14 years. As such I have now lost my source of income of $65,000 per year. I was at the top of the pay scale in my field. With the loss of my job and given that I am only receiving $444.00 per month in child support, the current visitation creates a hardship and it does not even cover the costs associated with travel for visitation. I have found it difficult to find a new position with equivalent pay that can accommodate Luke's travel and visitation schedule, especially with the COVID-19 situation and the need to do remote learning when Luke is exposed to the virus.

Due to the above-mentioned items I am requesting the court to modify the possession and access schedule as I am concerned for Luke's mental and emotional well-being. I am also requesting a modification in child support. I believe the modifications are in the best interest of my child.

_Raina M. Medary_
Raina Medary


Subscribed and sworn to before me by the said Raina Medary, on the 26TH day of
September , in the year 2020.

_Lucretia L. Wallace_
Notary Public, State of Texas



LUCRETIA L. WALLACE
My Notary ID # 3279589
Expires May 31, 2023



§    IN THE FAMILY DISTRICT COURT
§
§    TARRANT COUNTY TEXAS

## AMENDED TEMPORARY EMERGENCY STANDING ORDER

Pursuant to Texas Supreme Court's FIRST EMERGENCY ORDER REGARDING THE COVID-19 STATE OF DISASTER Misc. Docket No. 20-9042 this Court enters the following this Temporary Emergency Standing Order.

This Temporary Emergency Standing Order is effective May 30, 2020 and shall expire on December 31, 2020, unless extended by further order.

The Family District Courts shall be defined as the following courts: 231st District Court, 233rd District Court, 322nd District Court, 324th District Court, 325th District Court :

This applies in every divorce suit and every suit affecting the parent-child relationship filed in Tarrant County filed or pending in the following courts during the effective dates stated above.

**No party to this lawsuit has requested this order.** Rather, this order is a standing order of the Tarrant County Family District Courts. The District Courts of Tarrant County giving preference to family law matters have adopted this order because the parties, their children and the family pets should be protected, and their property preserved while the lawsuit is pending before the court. Therefore, IT IS **ORDERED:**

1. **NO DISRUPTION OF CHILDREN.** All parties are **ORDERED** to refrain from doing the following acts concerning any children who are subjects of this case:
    1.1 Removing the children from the State of Texas for the purpose of changing residence, acting directly or in concert with others, without the written agreement of both parties or an order of this Court.
    1.2 Disrupting or withdrawing the children from the school or day-care facility where the children are presently enrolled, without the written agreement of both parties or an order of this Court, unless that change is necessary because of school closures.
    1.3 Hiding or secreting the children from the other parent or changing the children's current place of abode, without the written agreement of both parties or an order of this Court.

1.4 Disturbing the peace of the children.

1.5 Making disparaging remarks regarding the other party in the presence or within the hearing of the children.

2. **PROTECTION OF FAMILY PETS OR COMPANION ANIMALS** . All parties are ordered to refrain from harming, threatening, interfering with the care, custody, or control of a pet or companion animal, possessed by a person protected by this order or by a member of the family or household of a person protected by this order.

3. **CONDUCT OF THE PARTIES DURING THE CASE.** All parties are **ORDERED** to refrain from doing the following acts:

   3.1 Using the vulgar, profane, obscene, or indecent language, or a coarse or offensive manner to communicate with the other party, whether in person or in any other manner, including by telephone or another electronic voice transmission, video chat, social media, or in writing, or electronic messaging, with intent to annoy or alarm the other party.

   3.2 Threatening the other party in person or in any other manner, including by writing, or electronic messaging, to take unlawful action against any person, intending by this action to annoy or alarm the other party.

   3.3 Placing one or more telephone calls or text messages, at an unreasonable hour, in an offensive or repetitious manner, without a legitimate purpose of communication, or anonymously with the intent to alarm or annoy the other party.

   3.4 Intentionally, knowing or recklessly causing bodily injury to the other party or to a child of either party.

   3.5 Threatening the other party or a child of either party with imminent bodily injury.

4. **PRESERVATION OF PROPERTY AND USE OF FUNDS DURING DIVORCE CASE.** If this is a divorce case, both parties to the marriage are **ORDERED** to refrain from intentionally and knowingly doing the following acts:

   4.1 Destroying, removing, concealing, encumbering, transferring or otherwise harming or reducing the value of the property of one or both of the parties.

   4.2 Falsifying a writing or record including an electronic record, relating to the property of either party.

   4.3 Misrepresenting or refusing to disclose to the other party or to the Court, on proper request, the existence, amount, or location of any tangible or intellectual property of one or both of the parties, including electronically stored or recorded information.

   4.4 Damaging or destroying the tangible or intellectual property of one of both of the parties, including any document that represents or embodies anything of value, and causing pecuniary loss to the other party, including electronically stored or recorded information.

   4.5 Tampering with the tangible or intellectual property of one or both of the parties, including any document, electronically stored or recorded information, that represents or embodies anything of value, and causing pecuniary loss to the other party.

   4.6 Selling, transferring, assigning, mortgaging, encumbering, or in any other manner alienating any of the property of either party, whether personal property or real

property or intellectual property, and whether separate or community, except as specifically authorized by this order.

4.7 Incurring any indebtedness, other than legal expenses in connection with this suit, except as specifically authorized by this order.

4.8 Making withdrawals from any checking or savings account in any financial institution for any purpose, except as specifically authorized by this order.

4.9 Spending any sum of cash in either party's possession or subject to either party's control for any purpose, except as specifically authorized by this order.

4.10  Withdrawing or borrowing in any manner for any purpose from any retirement, profit-sharing, pension, death, or other employee benefit plan or employee savings plan or from any individual retirement account or Keogh account, except as specifically authorized by this order.

4.11  Signing or endorsing the other party's name on any negotiable instrument, check, or draft, such as tax refunds, insurance payments, and dividends, or attempting to negotiate any negotiable instrument payable to the other party without the personal signature of the other party.

4.12  Destroying, disposing of, or altering, any financial records of the parties, including canceled checks, deposit slips, and other records from a financial institution, a record of credit purchases or cash advances, a tax return, and a financial statement.

4.13  Destroying, disposing of, or altering any email, text message, video message, or chat message or social media message or other electronic data or electronically stored information relevant to the subject matter of the suit for dissolution of marriage, regardless of whether the information is stored on a hard drive in a removable storage device, in cloud storage, or in another electronic storage medium.

4.14  Modifying, changing, or altering the native format or metadata of any electronic data or electronically stored information relevant to the subject matter of the suit for dissolution of marriage, regardless of whether the information is store on a hard drive in a removable storage device, in cloud storage, or in another electronic storage medium.

4.15  Deleting any data or content from any social network profile used or created by either party or a child of the parties.

4.16  Using any password or personal identification number to gain access to the other party's email account, bank account, social media account, or any other electronic account.

4.17  Taking any action to terminate or limit credit or charge cards in the name of the other party.

4.18  Entering, operating, or exercising control over the motor vehicle in the possession of the other party.

4.19  Discontinuing or reducing the withholding for federal income taxes on wages or salary.

4.20  Terminating or in any manner affecting the service of water, electricity, gas, telephone, cable television, or other contractual services, such as security, pest control,

landscaping, or yard maintenance at the other party's residence or in any manner attempting to withdraw deposits for service in connection with such services.

4.21    Excluding the other party from the use and enjoyment of the other party's specifically identified residence.

4.22    Opening or redirecting mail, email, or any other electronic communication addressed to the other party.

5. **PERSONAL AND BUSINESS RECORDS IN DIVORCE CASE.** "Records' means any tangible document or recording and includes email or other digital or electronic data, whether stored on a computer hard drive, diskette or other electronic storage device. If this is a divorce case, both parties to the marriage are **ORDERED** to refrain from doing the following acts: Concealing or destroying any family records, property records, financial records, business records or any records of income, debts, or other obligations; falsifying any writing or record relating to the property of either party.

6. **INSURANCE IN DIVORCE CASE.** If this is a divorce case, both parties to the marriage are **ORDERED** to refrain from doing the following acts: Withdrawing or borrowing in any manner all or any part of the cash surrender value of life insurance policies on the life of either party, except as specifically authorized by this order. Changing or in any manner altering the beneficiary designation on any life insurance on the life of either party or the parties' children. Cancelling, altering, or in any manner affecting any casualty, automobile, or health insurance policies insuring the parties' property or persons including the parties' minor children.

7. **SPECIFIC AUTHORIZATIONS IN DIVORCE CASE.** If this is a divorce case, both parties to the marriage are specifically authorized to do the following: To engage in acts reasonable and necessary to the conduct of that party's usual business and occupation; To make expenditures and incur indebtedness for reasonable and necessary living expenses for food, clothing, shelter, transportation and medical care; To make withdrawals from account in financial institutions only for the purposes authorized by this order.

8. **SERVICE AND APPLICATION OF THIS ORDER.** The Petitioner shall attach a copy of this order to the original petition and to each copy of the petition. At the time the petition is filed, if the Petitioner has failed to attach a copy of this order to the petition and any copy of the petition, the Clerk shall ensure that a copy of this order is attached to the petition and every copy of the petition presented. This order is effective upon the filing of the original petition and shall remain in full force and effect as a temporary restraining order for fourteen days after the date of the filing of the original petition. If no party contests this order by presenting evidence at a hearing on or before fourteen days after the date of the filing of the original petition, this order shall continue in full force and effect as a temporary injunction until it expires by the terms of this order or further order of the court. This entire order will terminate and will no longer be effective once the court signs a final order.

9. **EFFECT OF OTHER COURT ORDERS.** If any part of the order is different from any part of a protective order that has already been entered or is later entered, the protective order provisions prevail.

10. **BOND WAIVED.** IT IS **ORDERED** that the requirement of a bond is waived.

THIS TARRANT COUNTY STANDING ORDER REGARDING CHILDREN, PROPERTY AND CONDUCT OF PARTIES SHALL BECOME EFFECTIVE ON MAY 30, 2020 expire on December 31, 2020 unless extended by further order of this Court.

Hon. Jesus Nevarez
Judge, 231sts District Court

Hon. Jerome Hennigan
Judge, 324th District Court

Hon. Kenneth Newell
Judge, 233rd District Court

Hon. Judith G. Wells     5-19-2020
Judge, 325th District Court

Hon. James Munford     5-19-2020
Judge, 322nd District Court

9. **EFFECT OF OTHER COURT ORDERS.** If any part of the order is different from any part of a protective order that has already been entered or is later entered, the protective order provisions prevail.

10. **BOND WAIVED.** IT IS **ORDERED** that the requirement of a bond is waived.

THIS TARRANT COUNTY STANDING ORDER REGARDING CHILDREN, PROPERTY AND CONDUCT OF PARTIES SHALL BECOME EFFECTIVE ON MAY 30, 2020 expire on December 31, 2020 unless extended by further order of this Court.

Hon. Jesús Nevarez
Judge, 231sts District Court

Digitally signed by Kenneth
E. Newell, District Judge
Date: 2020.05.19 14:19:05
-05'00'

Hon. Kenneth Newell
Judge, 233rd District Court

Hon. James Munford   5-19-2020
Judge, 322nd District Court

Hon. Jerome Hennigan
Judge, 324th District Court

Hon. Judith G. Wells   5-19-2020
Judge, 325th District Court

THE STATE OF TEXAS
DISTRICT COURT, TARRANT COUNTY

*CITATION*                    *Cause No. 325-631159-17*

**INRE LUKE PINTO**

VS.

TO: THOMAS B PINTO

You said RESPONDENT are hereby commanded to appear by filing a written answer to the PETITION TO MODIFY PARENT-CHILD RELATIONSHIP at or before 10 o'clock A.M. of the Monday next after the expiration of 20 days after the date of service hereof before the 325th District Court in and for Tarrant County, Texas, at the Courthouse in the City of Fort Worth, Tarrant County, Texas said PETITIONER being

RAINA MEDARY

Filed in said Court on October 5th, 2020 Against
THOMAS B PINTO

For suit, said suit being numbered 325-631159-17 the nature of which demand is as shown on said PETITION TO MODIFY PARENT-CHILD RELATIONSHIP  a copy of which accompanies this citation.

MATTHEW TOWSON
Attorney for RAINA MEDARY Phone No. (972)584-9382
Address    2331 MUSTANG DR, SUITE 400 GRAPEVINE, TX 76051

_____ Thomas A. Wilder _____ , Clerk of the District Court of Tarrant County, Texas. Given under my hand and the seal of said Court, at office in the City of Fort Worth, this the 6th day of October, 2020.

By _____

KAREL JACKSON

A CERTIFIED COPY
ATTEST: 10/07/2020
THOMAS A. WILDER
DISTRICT CLERK
TARRANT COUNTY, TEXAS
BY: /s/ Karel Jackson

NOTICE: You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 AM. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you.
Thomas A. Wilder, Tarrant County District Clerk, 200 E WEATHERFORD, FORT WORTH TX 76196-0402

OFFICER'S RETURN *32563115917000065*

Received this Citation on the _____ day of _____, _____ at _____ o'clock ___M; and executed at _____ within the county of _____, State of _____ at _____ o'clock ___M on the _____ day of _____, _____ by delivering to the within named (Def.): _____ defendant(s), a true copy of this Citation together with the accompanying copy of PETITION TO MODIFY PARENT-CHILD RELATIONSHIP, having first endorsed on same the date of delivery.

Authorized Person/Constable/Sheriff: _____
County of _____ State of _____ By _____ Deputy
Fees $_____  _____
State of _____ County of _____ (Must be verified if served outside the State of Texas)
Signed and sworn to by the said _____ before me this _____ day of _____, ____
to certify which witness my hand and seal of office
(Seal)                    _____
County of _____, State of _____

*CITATION*

Cause No. 325-631159-17

INRE LUKE PINTO

VS.

ISSUED

This 6th day of October, 2020

Thomas A. Wilder
Tarrant County District Clerk
200 E WEATHERFORD
FORT WORTH TX 76196-0402

By                    KAREL JACKSON Deputy

MATTHEW TOWSON
Attorney for: RAINA MEDARY
Phone No. (972)584-9382
ADDRESS: 2331 MUSTANG DR, SUITE 400

GRAPEVINE, TX 76051

*FAMILY LAW*



*325631159170000065*
SERVICE FEES NOT COLLECTED
BY TARRANT COUNTY DISTRICT CLERK
ORIGINAL