# Exhibit A

EXECUTION VERSION

## EMPLOYMENT AGREEMENT

**EMPLOYMENT AGREEMENT** (this "<u>Agreement</u>"), dated as of September 3, 2019 (the "<u>Effective Date</u>"), by and between **NEWBRIDGE RESOURCES GROUP, LLC** (the "<u>Company</u>") and **SCOTT WOOD** (the "<u>Executive</u>"). All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in that certain Limited Liability Company Agreement of the Company, dated September 3, 2019 (the "<u>Operating Agreement</u>").

## W I T N E S S E T H:

**WHEREAS,** the Company desires to retain the services and employment of the Executive on behalf of the Company, upon the terms and conditions hereinafter set forth; and

**WHEREAS,** the Executive desires to enter into such employment with the Company, upon the terms and conditions hereinafter set forth.

**NOW, THEREFORE,** in consideration of the mutual covenants and promises contained herein and for good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto, each intending to be legally bound hereby, agree as follows:

1.      <u>Employment</u>. On the terms and subject to the conditions set forth herein, the Company hereby agrees to employ the Executive, and the Executive hereby agrees to accept such employment, for the Employment Term (as defined below). The Executive warrants and represents that he will not be in breach of any obligation owed to a third party by becoming employed by or working for the Company. During the Employment Term, the Executive shall serve as Chief Executive Officer of the Company and shall report to the Board of Directors of the Company (the "<u>Board</u>") or such other person as from time to time may be designated by the Board, performing the normal duties and responsibilities incidental to the position of Chief Executive Officer with respect to the business of the Company and such other duties and responsibilities as the Board may assign to the Executive from time to time.

2.      <u>Performance</u>. The Executive shall serve the Company faithfully and to the best of his ability and shall devote his full business time, energy, experience and talents to the business of the Company, and will not engage in any other employment activities for any direct or indirect remuneration without the written approval of the Board; provided that it shall not be a violation of this Agreement for the Executive to manage his personal investments, or to engage in or serve such civic, community, charitable, educational, or religious organizations as he may select, so long as such service does not create an actual or potential conflict of interest with, or interfere with the performance of, the Executive's duties hereunder or conflict with the Executive's covenants under Section 6 of this Agreement. Notwithstanding the foregoing, nothing in this Section 2 or otherwise in this Agreement shall prevent the Executive from (i) engaging in Future Opportunities to the full extent permitted by, and subject to the terms and conditions of, the Operating Agreement, and/or (ii) otherwise owning, solely as an investor, up to twelve and a half percent (12.5%) of the outstanding securities of any class of any publicly-traded securities of any company.

3.      <u>Employment Term</u>. The term of the Executive's employment under this Agreement shall be the period commencing on the Effective Date and continuing until the Date of Termination (as defined below) (such period of employment, the "<u>Employment Term</u>"). The Executive's

employment with the Company may be terminated at any time in accordance with terms and conditions of Section 7 and Section 8.

4.    Principal Location.   The Executive's shall perform the principal duties of his employment with the Company, in approximately equal amounts, in or near Santa Barbara, California and Houston, Texas; provided that, the Executive shall travel as necessary to fulfill the duties and responsibilities of the Executive's position with the Company.

5.    Compensation and Benefits.   During the Employment Term, the Company shall provide the Executive with the compensation and benefits outlined below.

(a)    Base Salary.   As compensation for the Executive's services hereunder and in consideration for the Executive's other agreements hereunder, the Company shall pay the Executive a base salary, payable biweekly in roughly equal installments in accordance with the Company's standard payroll procedures, at an annual rate of one million dollars ($1,000,000) (the "Base Salary"), subject to annual review and upward adjustments, at the discretion of the Board, beginning on September 1, 2021.

(b)    Benefits and Insurance. The Company shall reimburse the Executive for the Executive's actual out-of-pocket costs associated with the Executive's and, if applicable, the Executive's eligible dependents', participation in an individual health and welfare insurance plan, at the dental and medical coverage levels in effect as of the Effective Date, as well as other reasonable medical expenses (including, for example, deductibles and prescription costs, but not, for example, expenses related to voluntary cosmetic medical procedures) of up to $25,000 annually, subject to the Executive submitting a request for reimbursement in accordance with the terms outlined in Section 5(f) below.

(c)    Vehicle Allowance; Fuel Reimbursement. The Company shall pay the Executive a monthly vehicle allowance in the amount of $3,000.00 (the "Vehicle Allowance"). The Vehicle Allowance shall be paid in accordance with the Company's standard payroll procedures. In addition, the Company agrees to reimburse the Executive for the fuel costs incurred by the Executive when driving on Company business, subject to the Executive submitting a request for reimbursement in accordance with the terms outlined in Section 5(f) below.

(d)    Vacation.   The Executive shall be paid vacation and sick time per calendar year, in accordance with the established policies of the Company and its subsidiaries as of the date-hereof for an employee with twenty (20) or more years of experience.

(e)    Club Memberships.   The Company shall pay, on behalf of the Executive, the annual dues for Executive's Montecito Club and Houstonian Club memberships in a sum not to exceed one thousand eight hundred dollars ($1,800) per month, subject to the Executive submitting dues information in accordance with the terms outlined in Section 5(f) below.

(f)    Business Expenses.   The Executive shall be reimbursed by the Company for all reasonable, necessary and properly documented out-of-pocket business-related expenses actually incurred by him in performing the duties of his position, so long as the Executive submits all documentation for such expenses, as required by Company policy, if any, in effect from time to time.  Any such reimbursement of expenses shall be made by the Company within thirty

2

(30) days of the Company's receipt of the Executive's request for reimbursement, along with any applicable receipts or other substantiation documentation.

6.    <u>Covenants of the Executive</u>.  The Executive acknowledges that in the course of his employment with the Company he will become familiar with the Company's trade secrets and with other confidential and proprietary information concerning the Company, and that his services are of special, unique and extraordinary value to the Company.  Therefore, the Company and the Executive mutually agree that it is in the interest of both parties for the Executive to enter into the restrictive covenants set forth in this Section 6 to, among other things, protect the legitimate business interests of the Company, and that such restrictions and covenants contained in this Section 6 are reasonable in geographical and temporal scope and in all other respects given the nature of the Executive's duties and the nature of the Company's businesses and that such restrictions and covenants do not and will not unduly impair the Executive's ability to earn a living after termination of his employment with the Company.  The Executive further acknowledges and agrees that the Company would not have entered into this Agreement but for the restrictive covenants of the Executive set forth in this Section 6, and such restrictive covenants have been made by the Executive in order to induce the Company to enter into this Agreement. Notwithstanding anything to the contrary in this Section 6 or otherwise in this Agreement, Executive shall not be prohibited during or after the Employment Term from (i) engaging in Future Opportunities to the full extent permitted by, and subject to the terms and conditions of, the Operating Agreement, and/or (ii) otherwise owning, solely as an investor, up to twelve and one half percent (12.5%) of the outstanding securities of any class of any publicly-traded securities of any company.

(a)    <u>Noncompetition</u>.  During the Employment Term, the Executive shall not, directly or indirectly, own, manage, operate, control, consult with, be employed by or otherwise provide executive or managerial services of the type the Executive provides to the Company during the Employment Term to any business enterprise directly engaged in the management and operation of oil and gas producing properties (collectively, a "<u>Competitive Business</u>"), or participate in the ownership, management, operation or control of, or provide financing to, a Competitive Business, in each case, within the Territory.

(b)    <u>Nonsolicitation of Customers</u>.  During the Employment Term, the Executive shall not, directly or indirectly, on behalf, or for the benefit, of a Competitive Business, (i) solicit, call upon, or divert or actively take away from the Company, any person or entity that has obtained or contracted to obtain goods or services from the Company, or the Company is actively taking steps to solicit business from (each, a "<u>Restricted Customer</u>"); or (ii) attempt to solicit, call upon, divert or actively take away from the Company any such Restricted Customer; provided, that, in either case, the Executive has had business contact with such Restricted Customer.

(c)    <u>Nonsolicitation of Employees/Contractors</u>.  During the Employment Term and during the twelve (12) month period immediately following the Date of Termination (the "<u>Restricted Period</u>"), the Executive shall not, directly or indirectly, solicit or attempt to hire (as an employee or independent contractor), any person who, as of the Date of Termination, is an employee of the Company, or, during twelve (12) months immediately preceding the Date of Termination, was an employee or independent contractor of the Company, in either case, that the Executive had business contact with during the Employment Term.  Notwithstanding the

foregoing, nothing in this Section 6(c) or otherwise in this Agreement shall prevent the Executive from employing any person that initiates contact by responding to a solicitation for employment made by the Executive to the general public.

(d)     Confidential Information.     The Executive acknowledges that all information, inventions, trade secrets, know-how or other non-public, confidential or proprietary knowledge, information or data with respect to the products, services, operations, finances, business or affairs of the Company or with respect to confidential, proprietary or secret processes, methods, inventions, techniques, customers (including, without limitation, the identity of the customers of the Company and the specific nature of the services provided by the Company), employees (including, without limitation, the matters subject to this Agreement) or plans of or with respect to the Company or the terms of this Agreement (all of the foregoing collectively hereinafter referred to as, "Confidential Information") are property of the Company.  The Executive further acknowledges that the Company intends, and will make reasonable good faith efforts, to protect the Confidential Information from public disclosure.  Therefore, the Executive agrees that, except as required by law or regulation or as legally compelled by court order (provided that in such case, the Executive shall promptly notify the Company of such order, shall cooperate with the Company in attempting to obtain a protective order or to otherwise restrict such disclosure, and shall only disclose Confidential Information to the minimum extent necessary to comply with any such law regulation or order), during the Employment Term and at all times thereafter, the Executive shall not, directly or indirectly, divulge, transmit, publish, copy, distribute, furnish or otherwise disclose or make accessible any Confidential Information, or use any Confidential Information for the benefit of anyone other than the Company, unless and to the extent that the Confidential Information becomes generally known to and available for use by the general public other than as a result of the Executive's acts or omissions or such disclosure is necessary during the Employment Term and in the course of the Executive's proper performance of the duties of his employment. Executive understands that certain whistleblower laws permit Executive to communicate directly with governmental or regulatory authorities, including communications with the U.S. Securities and Exchange Commission about possible securities law violations. Executive acknowledges that he is not required to seek the Company's permission or notify the Company of any communications made in compliance with applicable whistleblower laws, and that the Company will not consider such communications to violate this or any other agreement between Executive and the Company or any Company policy by which Executive is bound.

(e)     Company Intellectual Property.  The Executive agrees to promptly disclose to the Company any and all work product, inventions, artistic works, works of authorship, designs, methods, processes, technology, patterns, techniques, data, Confidential Information, patents, trade secrets, trademarks, domain names, copyrights, and the like, and all other intellectual property relating to the business of the Company which are created, authored, composed, invented, discovered, performed, perfected, or learned by the Executive (either solely or jointly with others) during the Employment Term (collectively, together with such intellectual property as may be owned or acquired by the Company, the "Company Intellectual Property").  The Company Intellectual Property shall be the sole and absolute property of the Company.  All work performed by the Executive in authoring, composing, inventing, creating, developing or modifying Company Intellectual Property and/or other work product to which copyright protection may attach during the course of the Executive's employment with the Company shall be considered "works made for hire" to the extent permitted under applicable copyright law and will be considered the sole

4

property of the Company.  To the extent such works, work product or Company Intellectual Property are not considered "works made for hire," all right, title, and interest to such works, work product and Company Intellectual Property, including, but not limited to, all copyrights, patents, trademarks, rights of publicity, and trade secrets, is hereby assigned to the Company and the Executive agrees, at the Company's expense, to execute any documents requested by the Company at any time in relation to such assignment.  The Executive acknowledges and agrees that the Company is and will be the sole and absolute owner of all trademarks, service marks, domain names, patents, copyrights, trade dress, trade secrets, business names, rights of publicity, inventions, proprietary know-how and information of any type, whether or not in writing, and all other intellectual property used by the Company or held for use in the business of the Company, including all Company Intellectual Property.  The Executive further acknowledges and agrees that any and all derivative works, developments, or improvements based on intellectual property, materials and assets subject to this Section 6 created during the Employment Term (including, without limitation, Company Intellectual Property) shall be exclusively owned by the Company.  The Executive will cooperate with the Company, at no additional cost to such parties (whether during or after the Employment Term), in the confirmation, registration, protection and enforcement of the rights and property of the Company in such intellectual property, materials and assets, including, without limitation, the Company Intellectual Property.

(f)     Nondisparagement.  During the Employment Term and thereafter, the Executive shall refrain from publishing any oral or written statements about the Company or its employees, officers, directors, products, services, customers or owners that are malicious, obscene, threatening, harassing, intimidating or discriminatory and which are designed to harm any of the foregoing.  Nothing contained in this Section 6(f) shall preclude the Executive from enforcing his rights under this Agreement or truthfully testifying in response to legal process or a governmental inquiry.

(g)     Company Property.  All Confidential Information, Company Intellectual Property, files, records, correspondence, memoranda, notes or other documents (including, without limitation, those in computer-readable form) or property relating or belonging to the Company, whether prepared by the Executive or otherwise coming into his possession or control in the course of the Employment Term, shall be deemed to be a work for hire and will be the exclusive property of the Company and shall be delivered to the Company, and not retained by the Executive (including, without limitation, any copies thereof), promptly upon request by the Company and, in any event, promptly upon the Date of Termination.  The Executive acknowledges and agrees that he has no expectation of privacy with respect to the Company's telecommunications, networking or information processing systems (including, without limitation, stored computer files, email messages and voice messages), and that the Executive's activity and any files or messages on or using any of those systems may be monitored at any time without notice.

(h)     Enforcement.  The Executive acknowledges that a breach of his covenants and agreements contained in this Section 6 would cause irreparable damage to the Company, the exact amount of which would be difficult to ascertain, and that the remedies at law for any such breach or threatened breach would be inadequate.  Accordingly, the Executive agrees that if he breaches or threatens to breach any of the covenants or agreements contained in this Section 6, in addition to any other remedy which may be available at law or in equity, the Company shall be entitled to (i) institute and prosecute proceedings in any court of competent jurisdiction for specific

4

performance and injunctive and other equitable relief to prevent the breach or any threatened breach thereof without bond or other security, unless required by law, and (ii) seek an equitable accounting by any court of competent jurisdiction of all profits or benefits arising out of such violation.

(i)     Scope of Covenants.  The Company and the Executive agree that they consider the restrictions and covenants contained in this Section 6 to be reasonable and necessary for the protection of the interests of the Company, but if any such restriction or covenant shall be held by any court of competent jurisdiction to be void but would be valid if deleted in part or reduced in application, such restriction or covenant shall apply in such jurisdiction with such deletion or modification as may be necessary to make it valid and enforceable. The restrictions and covenants contained in each paragraph of this Section 6 shall be construed as separate and individual restrictions and covenants and shall each be capable of being reduced in application or severed without prejudice to the other restrictions and covenants or to the remaining provisions of this Agreement.

(j)     Disclosure of Restrictive Covenants.  During the Restricted Period, the Executive agrees to notify any prospective employer or other service recipient of the existence and terms of the restrictions and covenants contained in this Section 6, which are applicable during the Restricted Period, prior to commencing employment or engagement with any such employer or service recipient.

7.     Termination of Employment.

(a)     The Company's Right to Terminate the Executive's Employment for Cause. The Company shall have the right to terminate the Executive's employment hereunder at any time for Cause (as defined below), subject to the applicable terms and conditions of Section 7 and Section 8.  For purposes of this Agreement, "Cause" shall mean the occurrence of any of the following, as determined by the Board, in good faith, based upon reasonable and objective standards: (i) an act of fraud or embezzlement, or a material act of theft, misappropriation or conversion of any property belonging to the Company; (ii) any material violation by the Executive of any federal or state laws during Executive's employment with the Company that is detrimental to the Company's business, reputation, or goodwill, (iii) the Executive's indictment, conviction of, or plea of *nolo contendere* to, any felony (or state law equivalent), or any crime involving moral turpitude that results in material injury to the Company, (iv) any breach by the Executive of any material provision of this Agreement, including Executive's covenants under Section 6; *provided, however,* that such breach remains uncured by the Executive for fifteen (15) days after the Company first provided the Executive written notice of the obligation to cure such breach, but solely to the extent that such breach is susceptible to cure; (v) the Executive's repeated failure or refusal, after written notice from the Board, to perform any lawful directive of the Board or the duties of the Executive's employment as specifically outlined in this Agreement; *provided, however*, that such breach remains uncured by the Executive for seven (7) days after the Company first provided the Executive written notice of the obligation to cure such breach; (vi) the Executive's gross negligence, willful misconduct or breach of a fiduciary duty, in each case, in the performance of the Executive's duties as an employee, officer or director of the Company; (vii) Executive has reported to work under the influence of alcohol or illegal drugs more than once and in a manner as to cause a material disruption to the business of the Company (excluding non-

excessive social drinking in connection with client entertainment or social functions where appropriate in light of the circumstances); or (viii) the Executive's failure to cooperate, if requested by the Board, with any investigation or inquiry into his or the Company's business practices, whether internal or external, including, but not limited to, the Executive's refusal to be deposed or to provide testimony or evidence at any trial, proceeding or inquiry, in each case, during his employment with the Company.

(b)     The Company's Right to Terminate the Executive's Employment Without Cause. The Company shall have the right to terminate the Executive's employment hereunder at any time without Cause, subject to the applicable terms and conditions of Section 7 and Section 8.

(c)     The Executive's Right to Resign for Good Reason. The Executive shall have the right to resign from the Executive's employment with the Company at any time for Good Reason (as defined below), subject to the applicable terms and conditions of Section 7 and Section 8.     For purposes of this Agreement, "Good Reason" shall mean the occurrence of any of the following, in each case, without Executive's consent: (i) a material reduction to Executive's Base Salary; (ii) a breach by the Company of a material provision of this Agreement, (iii) a material adverse change in the Executive's title, authority, duties or responsibilities as the Chief Executive Officer of the Company; or (iv) a relocation of the Executive's principal place of employment with the Company to a geographic location that is more than one hundred (100) miles away from either of the Company's principal locations, as set forth in Section 4 of this Agreement. Notwithstanding the foregoing, no resignation by the Executive for Good Reason shall be effective unless the following conditions are satisfied: (A) the Executive provides written notice to the Board of the existence of such condition(s) or event(s) within sixty (60) days of the initial existence of the same; (B) the condition(s) or event(s) specified in such notice must remain uncorrected for forty-five (45) days following the Board's receipt of such written notice; and (C) Executive's resignation for Good Reason must occur no later than one-hundred and ten (110) days after the initial existence of the Good Reason event.

(d)     The Executive's Right to Resign Without Good Reason.     The Executive shall have the right to resign from the Executive's employment with the Company at any time without Good Reason, subject to the applicable terms and conditions of Section 7 and Section 8.

(e)     Termination Due to the Executive's Death or Disability. The Executive's employment with the Company will terminate immediately upon the Executive's death, and the Company shall have the right to terminate the Executive's employment hereunder upon the Disability of the Executive, in each case, subject to the applicable terms and conditions of Section 7 and Section 8.

(f)     For purposes of this Agreement, the term "Disability" shall mean the inability of the Executive to perform the Executive's essential duties and responsibilities (even with reasonable accommodation) under this Agreement for a period of more than ninety (90) consecutive days or one hundred and eighty (180) non-consecutive days during any twelve (12) month period by reason of a mental or physical disability as determined by the Board in its reasonable discretion.

7

          (g)    <u>Notice of Termination</u>. Any termination of the Executive's employment by the Company or by the Executive pursuant this Section 7 (other than termination pursuant to Section 7(e) on account of the Executive's death) shall be communicated by written notice of termination (each, a "<u>Notice of Termination</u>") to the other party hereto in the manner provided in Section 9. The Notice of Termination shall specify: (i) the termination provision of this Agreement relied upon; and (ii) the applicable Date of Termination.

          (h)    <u>Date of Termination</u>. For purposes of this Agreement, the "<u>Date of Termination</u>" shall be:

          (i)    If the Company terminates the Executive's employment for Cause, the date specified in the Company's Notice of Termination;

          (ii)    If the Company terminates the Executive's employment without Cause, the date specified in the Company's Notice of Termination, which shall be no less than thirty (30) days following the date on which the Notice of Termination is delivered; *provided that,* the Company shall have the option to provide the Executive with a payment equal to the Executive's pro rata Base Salary for thirty (30) days' in lieu of providing the Executive with such thirty (30) day notice period, which shall be paid in a lump sum on the Date of Termination and for all purposes of this Agreement, the Date of Termination shall be the date on which such Notice of Termination is delivered;

          (iii)    If the Executive terminates the Executive's employment for Good Reason, the date specified in the Executive's Notice of Termination;

          (iv)    If the Executive terminates the Executive's employment without Good Reason, the date specified in the Executive's Notice of Termination, which shall be no less than thirty (30) days following the date on which the Notice of Termination is delivered; *provided that,* the Company shall have the option to waive all or any part of the thirty (30) day notice period by giving written notice to the Executive and provide the Executive with a payment equal to the Executive's pro rata Base Salary for the portion of the notice period so waived, which shall be paid in a lump sum on the Date of Termination and for all purposes of this Agreement, the Date of Termination shall be the date determined by the Company and specified in such written notice from the Company; and

          (v)    If the Executive's employment is terminated on account of the Executive's death, the date of the Executive's death.

          **(vi)**    If the Executive's employment is terminated on account of the Executive's Disability, the date specified in the Company's Notice of Termination.

    8.    <u>Effect of Termination on Compensation and Benefits</u>.

          (a)    <u>COBRA</u>. Regardless of the reason for the termination of the Executive's employment, to the extent the Executive participates in the Company's group health plans, if any, the Executive may be eligible to elect post-termination health benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("<u>COBRA</u>") at the Executive's expense; *provided that,* the Executive timely elects such COBRA continuation coverage.

*4*

(b)      <u>Compensation upon Termination by the Company for Cause or Due to the Executive's Resignation without Good Reason</u>.  In the event the Executive's employment is terminated by the Company pursuant to Section 7(a) or the Executive resigns from the Executive's employment pursuant to Section 7(d), all of the Executive's rights and benefits provided for in this Agreement will terminate as of the Date of Termination; *provided, however*, that the Executive (or the Executive's estate, as applicable) will receive, as soon as reasonably practicable following the Date of Termination, or in such time frame as required by applicable law, a lump sum cash payment consisting of (i) any Base Salary earned, but not yet paid through the Date of Termination , (ii) any employee benefits to which the Executive is entitled upon the Date of Termination in accordance with the terms and conditions of the applicable plans of the Company, (iii) reimbursement for any unreimbursed business expenses incurred by the Executive prior to Date of Termination pursuant to Section 5(e), and (iv) payment for vacation and sick time accrued, but that remains unused, as of the Date of Termination (collectively, sub-sections (i)-(iv) are referred to as the "<u>Accrued Amounts</u>").

(c)      <u>Compensation upon Termination by the Company without Cause or Due to the Executive's Resignation for Good Reason</u>.  In the event the Executive's employment is terminated by the Company pursuant to Section 7(b) or the Executive resigns from the Executive's employment pursuant to Section 7(c), all of the Executive's rights and benefits provided for in this Agreement will terminate as of the applicable Date of Termination; *provided, however*, that the Executive will receive (i) as soon as reasonably practicable following the Date of Termination, or in such time frame as required by applicable law, a lump sum cash payment for the Accrued Amounts, and (ii) subject to Section 8(e) below, (A) a lump sum cash payment in an amount equal to twelve (12) months of Executive's Base Salary, which shall be paid no later than sixty (60) days following the Date of Termination, and (B) the Company shall continue to reimburse the Executive, on a monthly basis, for the out-of-pocket health insurance costs, in accordance with and subject to the terms and conditions of, Section 5(b), for a period of twelve (12) months following the Date of Termination.

**(d)**      <u>Compensation upon Termination Due to the Executive's Death or by the Company Due to the Executive's Disability</u>.  In the event the Executive's employment is terminated due to the Executive's death or by the Company due to the Executive's Disability, in either case, pursuant to Section 7(e), all of the Executive's rights and benefits provided for in this Agreement will terminate as of the applicable Date of Termination; *provided, however*, that the Executive will receive (i) as soon as reasonably practicable following the Date of Termination, or in such time frame as required by applicable law, a lump sum cash payment for the Accrued Amounts, and (ii) subject to Section 8(e) below, (A) a lump sum cash payment in an amount equal to six (6) months of Executive's Base Salary, which shall be paid  no later than sixty (60) days following the Date of Termination, and (B) the Company shall continue to reimburse the Executive, on a monthly basis, for the out-of-pocket health insurance costs, in accordance with and subject to the terms and conditions of, Section 5(b), for a period of six (6) months following the Date of Termination.

(e)      <u>Release of Claims</u>.  As a condition to receiving the benefits outlined in Section 8(c)(ii) or Section 8(d)(ii) (collectively, the "<u>Severance Benefits</u>"), the Executive agrees to execute and deliver to the Company on or before the Release Execution Date (as defined below)



and not revoke within any time provided by the Company to do so, a general release of all claims, obligations and liabilities of any kind whatsoever, that the Executive may have against the Company and its employees, officers, directors, owners and members, including, without limitation, those arising from or in connection with the Executive's employment or termination of employment with the Company or this Agreement (including, without limitation, civil rights claims), but excluding all claims to the Severance Benefits the Executive may have under this Section 8, any claims that are not waivable by law, and any claims the Executive may have arising out of or relating to the Operating Agreement and Executive's continuing rights thereunder (the "General Release"). The General Release shall be substantially in the form attached as Exhibit A, which the Company may from time to time reasonably modify to reflect any developments in applicable law and the circumstances of the Executive's separation from employment. If the General Release has not been executed and delivered and become irrevocable on or before the sixtieth (60th) day following the Date of Termination, the Severance Benefits shall not be or become due or payable. As used herein, the "Release Expiration Date" is that date that is twenty-one (21) days following the date upon which the Company delivers the General Release to the Executive (which shall occur no later than seven (7) days after the Date of Termination) or, in the event that such termination of employment is "in connection with an exit incentive or other employment termination program" (as such phrase is defined in the Age Discrimination in Employment Act of 1967), the date that is forty-five (45) days following such delivery date.

9.    Notices.    All notices, requests, demands, claims, consents and other communications which are required, permitted or otherwise delivered hereunder shall in every case be in writing and shall be deemed to have been properly delivered if: (a) delivered in person, (b) sent by registered or certified mail, in all such cases with first class postage prepaid, return receipt requested, or (c) delivered by a recognized overnight courier service, in each case, to the applicable party and addressed as set forth below:

If to the Company:

> NewBridge Resources Group, LLC
> 333 Clay Street, Suite 4400
> Houston, Texas 77002
> Attention: Klaus Hasbo

If to Executive:

> At the Executive's residence address as maintained by the Company in the regular course of its business for payroll purposes.

or to such other address as shall be furnished in writing by either party to the other party; *provided that* such notice or change in address shall be effective only when actually received by the other party. Date of service of any such notices or other communications shall be: (i) the date such notice is personally delivered, (ii) three days after the date of mailing if sent by certified or



registered mail, or (iii) one business day after date of delivery to the overnight courier if sent by
overnight courier.

      10.    <u>Section 409A</u>.

      (a)    Notwithstanding any provision of this Agreement to the contrary, all
provisions of this Agreement are intended to comply with Section 409A of the Internal Revenue
Code of 1986 (the "<u>Code</u>"), and the applicable Treasury regulations and administrative guidance
issued thereunder (collectively, "<u>Section 409A</u>") or an exemption therefrom and shall be construed
and administered in accordance with such intent. Any payments under this Agreement that may be
excluded from Section 409A either as separation pay due to an involuntary separation from service
or as a short-term deferral shall be excluded from Section 409A to the maximum extent possible.
For purposes of Section 409A, each installment payment provided under this Agreement shall be
treated as a separate payment. Any payments to be made under this Agreement upon a termination
of Executive's employment shall only be made if such termination of employment constitutes a
"separation from service" under Section 409A.

      (b)    To the extent that any right to reimbursement of expenses or payment of any
benefit in-kind under this Agreement constitutes nonqualified deferred compensation (within the
meaning of Section 409A), (i) any such expense reimbursement shall be made by the Company no
later than the last day of Executive's taxable year following the taxable year in which such expense
was incurred by Executive, (ii) the right to reimbursement or in-kind benefits shall not be subject
to liquidation or exchange for another benefit, and (iii) the amount of expenses eligible for
reimbursement or in-kind benefits provided during any taxable year shall not affect the expenses
eligible for reimbursement or in-kind benefits to be provided in any other taxable year; *provided*,
that the foregoing clause shall not be violated with regard to expenses reimbursed under any
arrangement covered by Section 105(b) of the Code solely because such expenses are subject to a
limit related to the period in which the arrangement is in effect.

      (c)    Notwithstanding any provision in this Agreement to the contrary, if any
payment or benefit provided for herein would be subject to additional taxes and interest under
Section 409A if the Executive's receipt of such payment or benefit is not delayed until the earlier
of the date of the Executive's death or the date that is six (6) months after the Date of Termination
(such date, the "<u>Section 409A Payment Date</u>"), then such payment or benefit shall not be provided
to the Executive (or the Executive's estate, if applicable) until the Section 409A Payment Date.
Notwithstanding the foregoing, the Company makes no representations that the payments and
benefits provided under this Agreement are exempt from, or compliant with, Section 409A and in
no event shall the Company be liable for all or any portion of any taxes, penalties, interest or other
expenses that may be incurred by Executive on account of non-compliance with Section 409A.

      11.    <u>General</u>.

      (a)    <u>Governing Law; Forum</u>.  This Agreement and the legal relations thus
created between the parties hereto shall be governed by and construed in accordance with, the
internal laws of the State of California, without giving effect to any choice of law or conflict of

law provision or rule (whether of the State of California or any other jurisdiction) that would cause the application of the law of any jurisdiction other than the State of California. With respect to any claim or dispute related to or arising under this Agreement, the parties hereby consent to the exclusive jurisdiction, forum and venue of the state and federal courts (as applicable) located in Santa Barbara County, California.

(b)     Construction and Severability. Whenever possible, each provision of this Agreement shall be construed and interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by, or invalid, illegal or unenforceable in any respect under, any applicable law or rule in any jurisdiction, such prohibition, invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other jurisdiction, and the parties undertake to implement all efforts which are necessary, desirable and sufficient to amend, supplement or substitute all and any such prohibited, invalid, illegal or unenforceable provisions with enforceable and valid provisions in such jurisdiction which would produce as nearly as may be possible the result previously intended by the parties without renegotiation of any material terms and conditions stipulated herein.

(c)     Cooperation. During the Employment Period and thereafter during the Restricted Period, the Executive shall cooperate with the Company and be reasonably available to the Company with respect to business-related matters that occur during the Executive's employment period with the Company and in which the Executive was involved or about which the Executive has personal knowledge, whether such matters are legal, regulatory or otherwise (including, without limitation, the Executive appearing at the Company's request to give testimony without requiring service of a subpoena or other legal process, volunteering to the Company all pertinent information and turning over to the Company all relevant documents which are or may come into the Executive's possession); *provided, however,* that to the extent such cooperation is required during the Restricted Period, the Company shall make reasonable efforts to minimize disruption of the Executive's other activities. As a condition to the Executive's cooperation obligations under this Section 11(c), the Company shall pay or reimburse the Executive for all travel and other reasonable out of pocket expenses incurred by the Executive in complying with his obligations under this Section 11(c).

(d)     Successors and Assigns. Except as otherwise stated in this Section 11(d), this Agreement shall bind and inure to the benefit of and be enforceable by the Company and its successors and assigns and the Executive and the Executive's heirs, executors, administrators, and successors. The services provided by the Executive under this Agreement are of a personal nature, and rights and obligations of the Executive under this Agreement shall not be assignable or delegable, except for any death payments otherwise due the Executive, which shall be payable to the estate of the Executive; *provided that* the Company may assign, with the prior written consent of the Executive, this Agreement to, and all rights hereunder shall inure to the benefit of, any subsidiary or affiliate of the Company or any person, firm or corporation resulting from the reorganization of the Company or succeeding to the business or assets of the Company by purchase, merger, consolidation or otherwise; and *provided further that* in the event of the Executive's death, any unpaid amount due to the Executive under this Agreement shall be paid to his estate. The Company may not assign this Agreement without the Executive's consent.

(e)   <u>Executive's Representations</u>.   The Executive hereby represents and warrants to the Company that: (i) the execution, delivery and performance of this Agreement by the Executive do not and shall not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which the Executive is a party or by which the Executive is bound; (ii) the Executive is not a party to or bound by any employment agreement, noncompetition or nonsolicitation agreement or confidentiality agreement with any other person or entity besides the Company; and (iii) upon the execution and delivery of this Agreement by the Company, this Agreement shall be the valid and binding obligation of the Executive, enforceable in accordance with its terms.   **THE EXECUTIVE HEREBY ACKNOWLEDGES AND REPRESENTS THAT THE EXECUTIVE HAS CONSULTED WITH INDEPENDENT LEGAL COUNSEL REGARDING THE EXECUTIVE'S RIGHTS AND OBLIGATIONS UNDER THIS AGREEMENT, TO THE EXTENT DETERMINED NECESSARY OR APPROPRIATE BY THE EXECUTIVE, AND THAT THE EXECUTIVE FULLY UNDERSTANDS THE TERMS AND CONDITIONS CONTAINED HEREIN.**

(f)   <u>Compliance with Rules and Policies</u>.   The Executive agrees to perform the duties of his employment with the Company in (i) accordance with any material policies, procedures and rules established, in writing, by the Company and the Board, which are applicable to the Executive's employment duties and made known to Executive, and (ii) in compliance with all material laws and regulations that are generally applicable to the Company and its employees, directors and officers; provided, however, that the Executive's negligent failure to comply with any such Company policy, procedure, or rule or law or regulation shall not be considered a material breach of this Agreement giving rise to Cause for termination under this Agreement.

(g)   <u>Withholding Taxes</u>.   All amounts payable hereunder shall be subject to the withholding of all applicable taxes and deductions required by any applicable law.

(h)   <u>Entire Agreement</u>.   This Agreement and the Operating Agreement constitute the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and terminates and supersedes any and all prior agreements, understandings and representations, whether written or oral, by or between the parties hereto or their affiliates which may have related to the subject matter hereof in any way. Notwithstanding any provision of this Agreement to the contrary, neither the reassignment of the Executive due to a reorganization or an internal restructuring of the Company nor a change in the title of the Executive's supervisor shall constitute a modification or a material breach of this Agreement; provided, however, that to the extent any such reassignment or change otherwise qualifies as Good Reason, this provision does not prevent, limit or otherwise restrict Executive from Good Reason for terminating this Agreement on that basis.

(i)   <u>Duration</u>.   Notwithstanding the Employment Term hereunder, this Agreement shall continue for so long as any obligations remain under this Agreement.

(j)   <u>Survival</u>. The covenants set forth in Sections 6 and 11(c) of this Agreement shall survive and shall continue to be binding upon the Executive notwithstanding the termination of this Agreement for any reason whatsoever.

13

(k)     <u>Amendment and Waiver</u>.   The provisions of this Agreement may be amended or waived only with the prior written consent of the Company and the Executive, and no course of conduct or course of dealing or failure or delay by any party hereto in enforcing or exercising any of the provisions of this Agreement (including, without limitation, the Company's right to terminate the Employment Term for Cause) shall affect the validity, binding effect or enforceability of this Agreement or be deemed to be an implied waiver of any similar or dissimilar requirement, provision or condition of this Agreement at the same or any prior or subsequent time. Pursuit by either party of any available remedy, either in law or equity, or any action of any kind, does not constitute waiver of any other remedy or action.   Such remedies and actions are cumulative and not exclusive.

(l)     <u>Counterparts</u>.   This Agreement may be executed in two or more counterparts, all of which taken together shall constitute one instrument.

(m)     <u>Section References</u>. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.  The words Section and paragraph herein shall refer to provisions of this Agreement unless expressly indicated otherwise.

(n)     <u>No Strict Construction</u>.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring either party hereto by virtue of the authorship of any of the provisions of this Agreement.

(o)     <u>Time of the Essence; Computation of Time</u>.  Time is of the essence for each and every provision of this Agreement.  Whenever the last day for the exercise of any privilege or the discharge of any duty hereunder shall fall upon a Saturday, Sunday, or any date on which banks in Houston, Texas are authorized to be closed, the party having such privilege or duty may exercise such privilege or discharge such duty on the next succeeding day which is a regular business day.

(p)     <u>No Third Party Beneficiaries</u>.  Nothing in this Agreement, express or implied, is intended or shall be construed to give any person other than the parties to this Agreement and their respective heirs, executors, administrators, successors or permitted assigns any legal or equitable right, remedy or claim under or in respect of any agreement or any provision contained herein.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound, have hereunto executed this Agreement as of the day and year first written above.

**COMPANY:**

**NEWBRIDGE RESOURCES GROUP, LLC**

By: _____

Name: _____ Klas Heskec ____

Title: _____

Date: _____ 3/9/2019 _____


**EXECUTIVE:**

_____

By:  Scott Wood

Date: _____

[Signature Page to Employment Agreement]

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound, have hereunto executed this Agreement as of the day and year first written above.

COMPANY:

NEWBRIDGE RESOURCES GROUP, LLC

By: _____

Name: _Klaus Hesbo_____

Title: _Director_____

Date: _____


EXECUTIVE:

_____

By:  Scott Wood

Date: _____

[Signature Page to Employment Agreement]

## EXHIBIT A
## FORM OF RELEASE AGREEMENT

This **GENERAL RELEASE OF CLAIMS** (the "Agreement") is entered into by **NEWBRIDGE RESOURCES GROUP, LLC** (the "Company") and **SCOTT WOOD** (the "Executive"). The Executive and the Company may sometimes be referred to individually as "**Party**," or collectively as the "**Parties**." Capitalized terms not defined herein have the meanings given to them in the Employment Agreement.

## RECITALS

WHEREAS, the Parties entered into an Employment Agreement effective as of August [____], 2019 (the "Employment Agreement"); and

WHEREAS, pursuant to Section 7 and Section 8 of the Employment Agreement, the Executive is entitled to receive certain Severance Benefits in exchange for, among other things, Executive's execution of this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each of the Parties, the Company and Executive, intending to be legally bound, hereby incorporate the recitals above herein and agree as follows:

1.      **General Release of Claims**.

(a)      In consideration of Executive's receipt of the Severance Benefits (as defined in the Employment Agreement) and the Company's promises in this Agreement, Executive hereby forever releases, discharges and acquits the Company and its respective past, present and future subsidiaries, affiliates, stockholders, members, partners, directors, officers, managers, insurers, executives, agents, attorneys, heirs, predecessors, successors and representatives in their personal and representative capacities, as well as all employee benefit plans maintained by any of the foregoing entities and all fiduciaries and administrators of any such plans, in their personal and representative capacities (collectively, the "**Company Parties**"), from liability for, and Executive hereby waives, any and all claims, damages, or causes of action of any kind related to Executive's employment with the Company, the termination of such employment, and any other acts or omissions related to any matter occurring or existing on or prior to the Signing Date, including (i) any alleged violation through such date of any federal, state or local anti-discrimination or anti-retaliation law; (ii) any public policy, contract, tort, or common law claim or claim for fiduciary duty or breach thereof or claim for fraud or misrepresentation or fraud of any kind; (iii) any allegation for costs, fees, or other expenses including attorneys' fees incurred in, or with respect to, a Released Claim (as defined below); (iv) any and all rights, benefits or claims Executive may have under any retention, change in control, bonus or severance plan or policy of any Company Party or any retention, change in control, bonus or severance-related agreement that Executive may have or have had with the Company other than the rights to the Severance Benefits described herein; (v) any and all rights, benefits or claims Executive may have under any employment contract (including the Employment Agreement), other than Executive's rights to the Severance Benefits, rights to compensation or any other entitlements under the Employment Agreement that

16

arise following the Date of Termination (as defined in the Employment Agreement) and are intended to survive Executive's termination of employment) or incentive compensation plan; and (v) any claim for compensation or benefits of any kind not expressly set forth in this Agreement (collectively, the "**Released Claims**").  This Agreement is not intended to indicate that any such claims exist or that, if they do exist, they are meritorious.  Rather, Executive is simply agreeing that, in exchange for the Severance Benefits (and any portion thereof), any and all potential claims of this nature that Executive may have against the Company Parties, regardless of whether they actually exist, are expressly settled, compromised and waived.  **THIS RELEASE INCLUDES MATTERS ATTRIBUTABLE TO THE SOLE OR PARTIAL NEGLIGENCE (WHETHER GROSS OR SIMPLE) OR OTHER FAULT, INCLUDING STRICT LIABILITY, OF ANY OF THE COMPANY PARTIES**.

(b)     In no event shall the Released Claims include (i) any claim that first arises after the Signing Date, (ii) any claim to vested benefits under an employee benefit plan, (iii) any claim arising out of future rights with respect to vested equity or equity incentives, (iv) any claim arising out of or related to Executive's continuing rights under the Operating Agreement, or (v) any pending or future claim with respect to: (A) Executive's rights under any directors & officers liability insurance policies then in effect, or (B) indemnification (including advancement of expenses) or contribution by the Company or any of its affiliates pursuant to contract or applicable law.

(c)     Notwithstanding this general release of liability, nothing in this Agreement prevents Executive from filing any non-legally waivable claim (including a challenge to the validity of this Agreement) with the Equal Employment Opportunity Commission, National Labor Relations Board, Occupational Safety and Health Administration, Securities and Exchange Commission, the Financial Industry Regulatory Authority (FINRA), or any other federal, state, or local governmental agency, authority, or commission (each, a "**Governmental Agency**") or participating in any investigation or proceeding conducted by any Governmental Agency. Executive understands that this Agreement does not limit Executive's ability to communicate with any Governmental Agency or otherwise participate in any investigation or proceeding that may be conducted by any Governmental Agency (including by providing documents or other information to a Governmental Agency) without notice to the Company or any other Company Party.  This Agreement does not limit Executive's right to receive an award from a Governmental Agency for information provided to a Governmental Agency.

2.     **Representations About Claims.**  Executive hereby represents and warrants that, as of the Signing Date, Executive has not filed any claims, complaints, charges, actions, or lawsuits of any kind against any of the Company Parties with any Governmental Agency or with any state or federal court or arbitrator for or with respect to a matter, claim, or incident that occurred or arose out of one or more occurrences that took place on or prior to the Signing Date.  Executive hereby further represents and warrants that Executive has made no assignment, sale, delivery, transfer or conveyance of any rights Executive has asserted or may have against any of the Company Parties with respect to any Released Claim.  Executive agrees not to bring or join any lawsuit against any of the Company Parties in any court relating to any of the Released Claims.

3.     **Executive's Acknowledgments.**  By executing and delivering this Agreement, Executive expressly acknowledges that:

(a)      This Agreement is written in a manner calculated to be understood by Executive and that he in fact understands the terms, conditions, and effects of this Agreement;

(b)      This Agreement refers to, among others, rights or claims arising under the Age Discrimination in Employment Act and Older Workers Benefit Protection Act;

(c)      Executive has carefully read this Agreement and has had sufficient time (and at least ___ days) to consider this Agreement before signing it and delivering it to the Company (the "Consideration Period").  Executive does not have to wait until the end of the Consideration Period to accept this Agreement, but Executive acknowledges that any decision to sign this Agreement before the Consideration Period expires is made voluntarily, and not because of any fraud or coercion or improper conduct by any Company Party.  If the Agreement is not signed by Executive within the Consideration Period, it is automatically revoked and is null and void;

(d)      Executive has been advised, and hereby is advised in writing, to discuss this Agreement with an attorney of Executive's choice and Executive has had adequate opportunity to do so prior to executing this Agreement;

(e)      Executive fully understands the final and binding effect of this Agreement; the only promises made to Executive to sign this Agreement are those stated herein; and Executive is signing this Agreement knowingly, voluntarily and of Executive's own free will, and understands and agrees to each of the terms of this Agreement;

(f)      The only matters relied upon by Executive and causing Executive to sign this Agreement are the provisions set forth in writing within the four corners of this Agreement;

(g)      Executive would not otherwise have been entitled to the Severance Benefits, or any portion thereof, but for Executive's agreement to be bound by the terms of this Agreement; and

(h)      no Company Party has provided any tax or legal advice regarding this Agreement and Executive has had the opportunity to receive sufficient tax and legal advice from advisors of Executive's own choosing such that Executive enters into this Agreement with full understanding of the tax and legal implications thereof.

4.      **Third-Party Beneficiaries.**  Executive expressly acknowledges and agrees that each Company Party that is not a signatory to this Agreement shall be a third-party beneficiary this Agreement and Executive's promises and acknowledgements herein.

5.      **Revocation Right**.  Executive may revoke this Agreement within the seven (7) day period beginning on the Signing Date (such seven-day period being referred to herein as the "Revocation Period").  To be effective, the revocation must be in writing signed by Executive and must be received by _____, at _____ before 11:59 p.m., central time, on the last day of the Revocation Period. This Agreement shall not become final and enforceable and

Executive shall not receive the Severance Benefits unless and until the Revocation Period has expired and Executive has not revoked this Agreement (the "<u>Effective Date</u>").

6.      **Governing Law**; Forum.  This Agreement and the legal relations thus created between the Parties hereto shall be governed by and construed in accordance with, the internal laws of the State of California, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of California or any other jurisdiction) that would cause the application of the law of any jurisdiction other than the State of California.  With respect to any claim or dispute related to or arising under this Agreement, the Parties hereby consent to the exclusive jurisdiction, forum and venue of the state and federal courts (as applicable) located in Santa Barbara, California.

7.      **Construction and Severability**.  Whenever possible, each provision of this Agreement shall be construed and interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by, or invalid, illegal or unenforceable in any respect under, any applicable law or rule in any jurisdiction, such prohibition, invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other jurisdiction, and the Parties undertake to implement all efforts which are necessary, desirable and sufficient to amend, supplement or substitute all and any such prohibited, invalid, illegal or unenforceable provisions with enforceable and valid provisions in such jurisdiction which would produce as nearly as may be possible the result previously intended by the Parties without renegotiation of any material terms and conditions stipulated herein.

9.      **Amendment and Waiver**.  The provisions of this Agreement may be amended or waived only with the prior written consent of the Company and the Executive, and no course of conduct or course of dealing or failure or delay by any Party hereto in enforcing or exercising any of the provisions of this Agreement shall affect the validity, binding effect or enforceability of this Agreement or be deemed to be an implied waiver of any similar or dissimilar requirement, provision or condition of this Agreement at the same or any prior or subsequent time.  Pursuit by either Party of any available remedy, either in law or equity, or any action of any kind, does not constitute waiver of any other remedy or action.  Such remedies and actions are cumulative and not exclusive.

10.     **Counterparts**.  This Agreement may be executed in two or more counterparts, all of which taken together shall constitute one instrument.

11.     **Section References**.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.  The words Section and paragraph herein shall refer to provisions of this Agreement unless expressly indicated otherwise.

*[Signature Page Follows]*

**IN WITNESS WHEREOF,** Executive has executed this Agreement as of the date set forth below, effective for all purposes as provided above.

**COMPANY:**                                      **EXECUTIVE:**

NEWBRIDGE RESOURCES GROUP, LLC

By:_____                     By:_____
Name:_____                     Name:_____
Title:_____                     Date:_____
Date:_____