# Exhibit C

ORIGINAL

**FILED**
Superior Court of California
County of Los Angeles

JUL 08 2020

Sherri R. Carter, Executive Officer/Clerk of Court
By ___Kristina Vargas___ , Deputy
Kristina Vargas

1 | **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
JOHN T. JASNOCH (281605)
2 | 600 W. Broadway, Suite 3300
San Diego, CA 92101
3 | Telephone: 619/233-4565
619/233-0508 (fax)
4 | jjasnoch@scott-scott.com

5 | *Counsel for Plaintiff Evergreen Capital Management LLC*

6 | [Additional counsel on signature page.]

7

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | COUNTY OF LOS ANGELES

10

11 | EVERGREEN CAPITAL MANAGEMENT ) Case No. **20STCV26290**
LLC, Individually and on Behalf of All Others )
12 | Similarly Situated, )
13 | Plaintiff, )
14 | vs. ) **VERIFIED CLASS ACTION COMPLAINT**
15 | THE BANK OF NEW YORK MELLON TRUST )
COMPANY, N.A. AS TRUSTEE FOR PACIFIC )
16 | COAST OIL TRUST and PACIFIC COAST )
ENERGY COMPANY LP, )
17 | Defendants. ) JURY TRIAL DEMANDED
18 | )
19 | )
20 | )
21 | )

22

23

24

25

26

27

28

VERIFIED CLASS ACTION COMPLAINT

Plaintiff Evergreen Capital Management LLC ("Evergreen" or "Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, brings this action (the "Action") against the Bank of New York Mellon Trust Company, N.A. as Trustee for the Pacific Coast Oil Trust (the "Trustee" for the "Trust") and Pacific Coast Energy Company LP ("PCEC") (collectively, "Defendants"), and alleges the following based upon personal knowledge, as to Plaintiff and Plaintiff's own acts, and upon information and belief, as to all other matters, based on investigations conducted by Plaintiff and by and through Plaintiff's attorneys, which includes, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings made by the Trust, and litigation involving some of the parties in this action. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after being given the opportunity to conduct reasonable discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      The Trust is a passive investment vehicle which was formed in 2012 solely for the benefit of the Trust Unitholders, such as Plaintiff and the Class. The Trust owns the right to the majority of profits from certain oilfields located in California (the "Trust Profit Interest"). PCEC operates those oil fields and also provides operational and administrative services to the Trust. There is a conveyance agreement between PCEC and the Trustee that governs the calculation of cash payments from the revenue generated by the oil fields to the Trust, which are then paid out as distributions to the Trust Unitholders. The Trust is subject to dissolution if it receives less than $2 million of distributable income for two consecutive years.

2.      This structure served Trust Unitholders well. From March 2017 through September 2019, the Trust paid distributions to Trust Unitholders for every month except for one. But then in September 2019, Scott Y. Wood ("Wood") took over PCEC, and the Trust Unitholders began to suffer immediate harm.

3.      First, PCEC slowed the flow of profits being sent to the Trust, while continuing to maintain its own monthly service fees, so that the Trust Unitholders have (except with one token distribution in January 2020) no longer received distributions since September 2019. The distribution cut-off in September 2019 was especially egregious because it was based on profits from August 2019, when Wood did not yet formally take over PCEC. This suggests that Wood meddled with the

1

1  distributions based on profits that were produced before he took control of PCEC, which were rightfully

2  owed to the Trust Unitholders.

3       4.    Second, PCEC stated that, in calculating the profits generated from the oilfields owned

4  that the Trust is entitled to, it would massively increase the estimated abandonment and plugging costs

5  to calculate its asset retirement obligations ("ARO").  The increase was massive and without basis.

6  Abandonment and plugging costs should be assessed against revenue over the lifetime of a well, not

7  pulled forward in their entirety to offset present revenue.  The treatment sought by PCEC does not comply

8  with GAAP or industry practice.  Furthermore, PCEC is violating the conveyance agreement with the

9  Trust by calculating the profits due to the Trust in an unsupportable manner that unfairly deprives the

10  Trust and Trust Unitholders of their rightful share of the profits, and in so acting is also violating its

11  implied obligation to act in good faith under the Trust Agreement.

12       5.    This news led to more than a 75% decline in the trading value of Trust Units, which had

13  already declined by approximately 50% since the news from two months earlier that Wood gained control

14  of PCEC.  The New York Stock Exchange ("NYSE") gave the Trust notice that it no longer complied

15  with NYSE listing standards, and would have only a limited period to come back into compliance or face

16  delisting.  Compliance would require that the Trade Units have an average trading price of $1 per unit

17  for a 30-day period before the deadline for delisting is reached.  Since the PCEC cost estimates were

18  publicly disclosed, the Trade Units have never reached as high as $1 per unit.  After already receiving an

19  extension, the Trust has less than two months – until August 5, 2020 – to come into compliance.

20       6.    The decline in the trading value of the Trust Units *cannot* be attributed to general market

21  conditions.  Instead, the decline is primarily due to PCEC's misconduct.  The oil wells from which the

22  Trust drew revenue generally sells at the Midway Sunset and Buena Vista Hills crude oil prices, which

23  trade at a premium to West Texas Intermediate ("WTI") (the most frequently used reference for U.S. oil

24  prices).  The two-year chart below shows that until Wood took control of PCEC, the Trust Units' trading

25  prices were aligned with those oil prices.  But after Wood took control of PCEC and caused it to engage

26  in improper withholdings and accounting, the Trust Units' trading prices plummeted even when the oil

27  market remained healthy, and then when the oil market was troubled, the Trust Unit values were

28  depressed even further.



Midway Sunset California Oil Price - Chevron (L1) 64.31
Buena Vista California Oil Price - Chevron (L1) 68.86
ROYT (R1)                                    0.5294
WTI Crude Oil (L1)                           61.06

7.      The Trust's difficulties were compounded by the resignation of its auditor. PricewaterhouseCoopers ("PwC"). Not having an auditor meant that the Trust could not file its quarterly or annual financial reports. and the Trust does not expect to be in a position to file until the end of June and July 2020.

8.      The evidence demonstrates that PCEC's misleading and unsupported cost estimates were made at the instigation of Wood as part of a deliberate scheme to starve the Trust of revenue. which to date has caused and will continue to cause. direct damage to Trust Unitholders through the decline in the trading value of Trust Units and through the loss of distributions.  Furthermore. the Trust Unitholders will be further harmed if the Trust Units are delisted from the NYSE. because delisting could lead to a permanent crippling of liquidity for Trust Unitholders.  PCEC's actions that cripple the Trust's revenue sources also threaten to lead to irreparable harm to Trust Unitholders through the dissolution of the Trust.

9.      Trust Unitholders are further harmed by the gross negligence evidenced through the Trustee's passive response to the above-mentioned events.  Plaintiff's counsel wrote to or spoke with the

3

1 | Trustee or its counsel several times between December 2019 to April 2020 to put them on notice of the
2 | above-mentioned problems. In its April 2020 letter to the Trustee's counsel, Plaintiff's counsel expressed
3 | that given the looming delisting deadline, the Trustee must take concrete action but has not yet received
4 | a response.

5 |      10.    Plaintiff now brings this suit on behalf of itself and similarly situated Trust Unitholders to
6 | prevent irreparable harm and to seek damages for breach of the Trust Agreement as to the Trustee and
7 | PCEC.

8 | **JURISDICTION AND VENUE**

9 |      11.    This Court has subject matter jurisdiction over this action pursuant to the California
10 | Constitution, Article VI, §10.

11 |      12.    This Court has personal jurisdiction under California Code of Civil Procedure §410.10
12 | because Defendants or their agents either reside in or conduct business in California, including that
13 | related to the underlying misconduct at issue in this action.

14 |      13.    Specifically, the Court has personal jurisdiction over PCEC because it is headquartered in
15 | Los Angeles, California, and manages extensive property in Santa Barbara and other locations in
16 | California.

17 |      14.    Because the Trust's sole source of revenues is derived from properties that are primarily
18 | located in California, and the Trustee must have regular contact with PCEC over the regular course of
19 | business, the Trustee projects itself into Los Angeles, California, through its contact with PCEC,
20 | including through contact with PCEC regarding ARO estimates directly at issue in this litigation, and
21 | therefore, subjects itself to personal jurisdiction in California.

22 |      15.    This Court is a proper venue under C.C.P. §395 because at least one defendant, PCEC, is
23 | headquartered in, and therefore resides in, Los Angeles, California.

24 | **PARTIES**

25 | **A.**    **Plaintiff**

26 |      16.    Plaintiff Evergreen Capital Management LLC has been a beneficial owner of Trust Units
27 | since the initial public offering in 2012 and has continuously held Trust Units since then.

28 |

4

**B.    Defendants**

17.    Defendant The Bank of New York Mellon Trust Company, N.A. as Trustee for Pacific Coast Oil Trust is the trustee for the Trust.

18.    Defendant Pacific Coast Energy Company LP is the trustor for and provides operational and administrative services to the Trust.  PCEC is headquartered in Los Angeles, California, and it manages oil wells in the Santa Barbara area of California.

19.    Defendants the Trustee and PCEC are collectively referred to herein as the "Defendants."

**C.    Relevant Non-Parties**

20.    The Trust is a passive investment vehicle whose sole purpose is to receive the Trust Profit Interest from PCEC and to distribute those revenues to the Trust Unitholders.  The Trust gives Houston, Texas as its headquarters, likely because a Houston executive of the Trustee is designated to handle the Trustee's responsibilities for PCEC.  But as its name indicates, the Trust's primary economic interests are profit interests in California oil wells.  The Trust Estate is divided into Trust Units, which trade on the NYSE under the ticker symbol, ROYT.  The Trust Units were originally held by PCEC, which then sold all of its units to public investors through initial and secondary public offerings from 2012 through 2014, and now public investors constitute all Trust Unitholders.

21.    Scott Y. Wood ("Wood") is the chief executive officer of PCEC.

22.    Robert Foss ("Foss") is the chief financial officer of PCEC.

23.    Philip Brown ("Brown") is the senior vice president of operations of PCEC.

**THE RELATIONSHIPS BETWEEN THE TRUST, TRUSTEE, AND TRUSTOR**

24.    PCEC spun off the Trust in 2012. Under the terms of the Trust Agreement, PCEC received 38 million Trust Units, and in exchange, the Trust would have the right to receive a percentage of profits from oil well properties that PCEC operates.  PCEC sold 18 million of its units in an initial public offering in 2012 for approximately $347 million.  About a year later, PCEC sold most of its remaining Trust Units in a secondary offering for approximately $320 million.  Finally, in June 2014, PCEC distributed its remaining 3.87 million Trust Units to its management and owners, who proceeded to sell 2.65 million units in another secondary offering.

25.     The Trust has no operating business of its own. Nor does the Trust have any right to acquire any property of its own. Rather, it is an investment vehicle where its sole purpose for existing is to distribute to the Trust Unitholders the revenue it receives from a designated list of properties managed by PCEC.

26.     The Trust's 2018 annual report describes the business as follows: "The Trust has no employees. The business and affairs of the Trust are administered by the Trustee. The Trust's purpose is to hold the Conveyed Interests, to distribute to the Trust unitholders cash that the Trust receives in respect of the Conveyed Interests and the Trust Units. The Trust does not conduct any operations or activities. . . . The Trust derives all or substantially all of its income and cash flow from the Conveyed Interests."

27.     Although the Trustee's role is to manage the Trust, the Trustee does not have a staff to actively operate the Trust. Rather, the Trustee pays the Trustor, PCEC, an annual fee of approximately $1.1 million to provide administrative and operational services. The Trustee collects fees of approximately $200,000 per year.

28.     PCEC, as the Trustor, operates oil and gas properties, primarily in Santa Barbara, California. PCEC itself is headquartered in Los Angeles, California. PCEC is structured as a limited partnership, with a general partner, Pacific Coast Energy Holdings LLC ("PCEH"), which controls the management of PCEC. PCEC, in addition, extends a $1 million credit line to the Trust.

29.     The Trust has no directors or officers or any employees. The Trustee, similarly, does not utilize a board of directors or board of trustees in its capacity as the trustee of the Trust.

**DEFENDANTS' DUTIES**

30.     Under the Delaware Statutory Trust Act ("DSTA"), the duties of the parties to the Trust (the beneficial owners, the trustee, and trustor) are those under the common law of trusts, except to the extent that these duties are modified or eliminated by the "governing instrument." The DSTA provides that "[t]o the extent that, at law or in equity, a trustee or beneficial owner or other person has duties (including fiduciary duties) to a statutory trust or to another trustee or beneficial owner or to another person that is a party to or is otherwise bound by a governing instrument, the trustee's or beneficial owner's or other person's duties may be expanded or restricted or eliminated by the provisions in the

6

governing instrument; provided, that the governing instrument may not eliminate the implied contractual covenant of good faith and fair dealing." 12 Del. C. §3806(c). The governing instrument "[m]ay provide rights to any person, including a person who is not a party to the governing instrument[.]" 12 Del. C. §3806(b)(8).

31.    The governing instrument for the Trust is the Amended and Restated Trust Agreement of Pacific Coast Oil Trust Among Pacific Coast Energy Company LP and Wilmington Trust, National Association and The Bank of New York Mellon Trust Company, N.A., dated as of: May 8, 2012 (the "Trust Agreement"). Defendants the Trustee and PCEC are parties to the Trust Agreement.

32.    The Trust Unitholders, though not directly parties to the contract, are third-party beneficiaries or are directly related to the Trust Agreement with standing to sue because the Trust is established expressly for their benefit. The Trust Agreement states, "The Trustee declares that it shall hold the Trust Estate in trust for the benefit of the Trust Unitholders, upon the terms and conditions set forth in this Agreement. *As set forth above and amplified herein, the Trust is intended to be a passive entity limited to the receipt of revenues attributable to the Conveyed Interests and the distribution of such revenues, after payment of or provision for Trust expenses and liabilities, to the Trust Unitholders.* It is not the intention of the parties hereto to create, and nothing in this Agreement shall be construed as creating, for any purpose, a partnership, joint venture, joint stock company or similar association[.]" Trust Agreement §2.04 [emphasis added].

33.    Furthermore, Trust Unitholders are given specific rights under the Trust Agreement. For example, the Trustee needs "the express approval of Trust Unitholders of record holding at least 75% of the then outstanding Trust Units" to terminate the Trust Agreement or Conveyance. *Id.* at §3.01(a). Similarly, with limited exceptions, the Trustee may not "sell or dispose of . . . all or any part of the Trust Estate" without "approv[al] by the Trust Unitholders of record holding at least 75% of the then outstanding Trust Units[.]" *Id.* at §3.02(b).

34.    Article IV of the Trust Agreement further outlines the rights of the Trust Unitholders, stating, "Each Trust Unit shall represent pro rata undivided ownership of the Beneficial Interest and shall entitle its holder to participate pro rata in the rights and benefits of Trust Unitholders under this Agreement. A Trust Unitholder (whether by assignment or otherwise) shall take and hold each Trust

7

Unit subject to all the terms and provisions of this Agreement and the Conveyance. . . . [T]he Trust Unitholders shall be entitled, to the fullest extent permitted by law, to the same limitation of personal liability extended to stockholders of private corporations for profit organized under the General Corporation Law of the State of Delaware." *Id.* at §4.02.

35.    The Trust Agreement does not bar Trust Unitholders' right to prosecute ***direct*** claims on their own and other Unitholders' behalf, because those claims belong to the unitholders personally.

36.    Direct claims are the ones where the damages are suffered by the unitholders directly and where the unitholders receive the benefit of recovery. *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004).

37.    Furthermore, the Delaware Court of Chancery has held that "direct claims exist when the entity at issue is a mere pass through entity and the benefits flow directly back to the investors." *Sehoy Energy LP v. Haven Real Estate Group, LLC*, C.A. No. 12387, 2017 WL 1380619, at *8 (Del. Ch. Apr. 17, 2017).  Because the Trust is a passive vehicle established solely to pass revenues from the Trust Profit Interest to Trust Unitholders, the Trust Unitholders have standing to assert direct claims for acts that injure them, such as a loss in value to the Trust Units or loss of distributions.  Similarly, the Delaware Court of Chancery held that shareholders in a trust who are entitled to distribution of trust funds may assert direct contractual claims related to claims of improper payments made from those funds. *Ruffalo v. Transtech Serv. Partners, Inc.*, C.A. No. 5039, 2010 WL 3307487, at *9, *15 (Del. Ch. Aug. 23, 2010). Furthermore, a party to a contract has a right to sue directly for enforcement of its contract rights. *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 179 (Del. 2015).

38.    Thus, the Trust Unitholders retain direct claims for breaches of the Trust Agreement and tortious interference with the Trust Agreement.

39.    The Trust and Trust Agreement "shall be governed by the laws of the State of Delaware (without regard to the conflict of laws principles thereof) in effect at any applicable time in all matters, including the validity, construction and administration of this Agreement and the Trust, the enforceability of the provisions of this Agreement, all rights and remedies hereunder, and the services of the Delaware Trustee and Trustee hereunder.  Furthermore, except as otherwise provided in this Agreement, the rights, powers, duties and liabilities of the Delaware Trustee, the Trustee and the Trust Unitholders shall be as

8

1  provided under the [Delaware Statutory] Trust Act and other applicable laws of the State of Delaware[.]"
2  *Id.* at §12.07.

3      40.    The Trust Agreement also states: "Neither PCEC nor any of its affiliates shall be a
4  fiduciary with respect to the Trust or the Trust Unitholders. To the extent that, at law or in equity, PCEC
5  or its Affiliates have duties (including fiduciary duties) and liabilities relating thereto to the Trust or to
6  the Trust Unitholders, such duties and liabilities are hereby eliminated and waived to the fullest extent
7  permitted by law." *Id.* at §12.11.

8      41.    However, despite the disclaimer, under the terms of the DSTA, as described above, PCEC
9  continues to have a statutory obligation to adhere to the "implied covenant of good faith and fair dealing."
10  As the Delaware Supreme Court recently explained in a case involving an oil pipeline company: "The
11  implied covenant is inherent in all contracts and is used to infer contract terms to handle developments
12  or contractual gaps that the asserting party pleads neither party anticipated. It applies when the party
13  asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby
14  frustrating the fruits of the bargain that the asserting party reasonably expected." *Dieckman v. Regency*
15  *GP LP*, 155 A.3d 358, 367 (Del. 2017). "[W]here . . . the express terms of the partnership agreement
16  naturally imply certain corresponding conditions, unitholders are entitled to have those terms enforced
17  according to the reasonable expectations of the parties to the agreement . . . . The implied covenant is
18  well-suited to imply contractual terms that are so obvious that the drafter would not have needed to
19  include the conditions as express terms in the agreement." *Id.* at 361.

20      42.    Recent Delaware cases have applied the implied covenant claim to several situations in
21  the oil and gas industry. These have included finding breach of the implied covenant where a company
22  has made false disclosures, in *Regency GP*, 155 A.3d at 367, and making representations that caused
23  public unit prices to drop in value, thereby manipulating the prices to enable a party to exercise an option
24  to buy up units cheaply. *See In re CVR Refining, LP Unitholder Litig.*, C.A. No. 2019-0062, 2020 WL
25  506680 (Del. Ch. Jan. 31, 2020); *Bandera Master Fund LP v. Boardwalk Pipeline Partners LP*, C.A.
26  No. 2018-0372, 2019 WL 4927053 (Del. Ch. Oct. 7, 2019).

27
28

## SUBSTANTIVE ALLEGATIONS

**A.**   **Wood's History of Misconduct Proves that He Controls Companies for Personal Gain**

43.   Wood formerly controlled another oil and gas company based in Texas called ERG Resources LLC ("ERG"). ERG filed for bankruptcy in April 2015. About a year later, the Bankruptcy Trustee filed a suit against Wood alleging breaches of fiduciary duty. The Bankruptcy Trustee's lawsuit alleges that "Wood dominated and controlled the Debtors and operated them by his own rules, and used the Debtors' assets to fund his lavish lifestyle." *Searcy v. Wood*, Adv. No. 15-31858, Complaint (Bk. N.D. Tex. April 25, 2016).

44.   Specifically, the Bankruptcy Trustee alleged that "during the two years preceding bankruptcy, Wood caused the Debtors to (a) pay him over $25 million in distributions and salary; (b) spend more than $5 million to sponsor and fund his polo team. . .; (c) pay approximately $700,000 for . . . maintenance expenses for his homes; and (d) pay more than $2.35 million to his divorce lawyers and other professionals engaged by him during his matrimonial proceedings."

45.   The Bankruptcy Trustee further emphasized, "Wood used the Debtors as his personal bank account until his resignation the day before the bankruptcy filing, taking one last check for $300,000 just before he walked out the door."

46.   The Bankruptcy Trustee alleged that based on his review of ERG's books and records, "Wood diverted more than $34,000,000 from the Debtors for his own use and benefit and for no consideration."

47.   Wood was able to use ERG as a personal piggybank because, according to the Bankruptcy Trustee, it was "solely managed by Wood" and ERG had no board of directors "to act as a check on Wood's cavalier looting of the Debtors' cash."

48.   Wood took over $15 million in distributions from ERG in the two years before the bankruptcy, and those "[d]istributions were unrelated to the Debtors' operations or profits and were simply a source of cash for Wood." He also took more than $10 million in salary for the two years before the bankruptcy filing and the salary, rather than being based on an employment agreement, appeared to be "based on nothing more than his own personal needs."

49.     Furthermore, Wood had ERG "fully fund[]" his polo playing by "creat[ing] the ERG Polo Team and siphon[ing] millions of dollars from the Debtors to sponsor the team and polo playing in general" – ultimately spending almost $6 million of ERG's money "for Wood's personal benefit without receiving any consideration [for ERG.]"

50.     Using his exorbitant distributions and salary from ERG, Wood purchased a ranch in Santa Barbara, California, and further spent $700,000 of ERG's money on maintaining this property.

51.     Wood also had ERG pay more than $2.3 million to "various professionals retained by Wood[] in connection with his divorce."

52.     The Bankruptcy Trustee settled with Wood about a year later.  But even the settlement drew an objection by a creditor, Nabors Global Holdings II, Ltd. ("Nabors"), which protested that the settlement would allow Wood to "give control of . . . litigation back to Mr. Wood" and lead to a "transfer of control of trust assets to Mr. Wood[.]"  Furthermore, Nabors protested that "[t]he bulk of the settlement consideration is a promissory note payable by Mr. Wood.  There is no evidence that Wood will have the ability – or even the motivation – to repay the note."  The Bankruptcy Trustee settled Nabors' objection by ensuring that recoveries go first to the bankruptcy trust and only the surplus would go to Wood.

**B.      PCEC, Directed by Wood, Engages in Misconduct to Destroy Trust Value**

53.     On September 3, 2019, an entity Wood controls, NewBridge Resources Pacific LLC ("NewBridge"), acquired control of PCEH, the general partner of PCEC, and therefore, Wood acquired effective control of PCEC.  Wood then became the CEO of PCEC, further cementing his control.

54.     Shortly afterward, on September 30, 2019, the Trust announced that there would be no distribution in October 2019, which was the first time since May 2018 that the Trust did not pay a distribution.  This cut-off of distributions is especially egregious because the profits that it was based on were from August 2019, which suggests that Wood meddled with distributions to the Trust Unitholders that they were rightfully owed based on profits earned before Wood took control of PCEC.  Since Wood took control of PCEC, the Trust has paid distributions only once – a token amount in January 2020.

55.     On October 10, 2019, the Trust announced that PwC had resigned as the Trust's accountant and auditor, and that PwC had informed the Trustee "that information had come to PwC's

attention that causes PwC to be unwilling to be associated with the Trust's financial statements in the future."

56.     On November 13, 2019, the Trust disclosed that PwC had informed the Trustee "that its resignation was the result of the change of ownership of PCEH." The Trust also disclosed, "The Trustee understands that Mr. Wood was affiliated with, and may have been an executive officer of, ERG Intermediate Holdings, LLC, which filed for bankruptcy protection in 2015."

57.     Also on November 13, 2019, the Trust disclosed that owing to PwC's resignation and the need for the Trust to retain a new auditor, the Trust would have to delay filing its quarterly and annual financial reports with the U.S. Securities and Exchange Commission ("SEC").

58.     On November 13, 2019, the Trust announced that PCEC gave the Trustee notice that "its current undiscounted estimate of total future amount of plugging and abandonment costs attributable to the Trust is approximately $56.7 million" and that "the amount [] PCEC has estimated appears likely to eliminate the likelihood of significant payments to the Trust under its Net Profits Interest beginning in January 2020."

59.     PCEC did not disclose the basis for its estimate. However, as disclosed in the Trust's 2018 annual report (which includes lease operating expenses, production and other taxes, and development expenses), the Trust's total costs for that year were approximately $46 million, so PCEC's estimate for only one type of expense already exceeded the Trust's entire annual costs.

60.     PCEC's estimates violate GAAP and industry practice.  Under those standards, abandonment and plugging costs should be assessed against revenue over the lifetime of the oil wells. Instead, PCEC has improperly pulled the entirety of their costs forward to offset present revenue.

61.     Furthermore, by improperly lowering its profit calculations through improperly pulling up costs that have not been incurred, PCEC is violating the conveyance agreement with the Trust by calculating profits in a manner that fails to comport with the methodology required by the conveyance agreement.  Its improper conduct, in turn, violates its implied covenant to act in good faith under the Trust Agreement, by starving the Trust of revenue and wrongfully depriving Trust Unitholders of distributions.

62.     These developments caused a nosedive in the value of the Trust Units.  On September 3, 2019, the date when the Trust announced that NewBridge acquired PCEC, the Trust Units traded at $2.12 per unit.  Thereafter, the units slid in value until they traded at $1.08 on November 13, 2019.  But the next day, after the market took in the news that PCEC might bring up unexpectedly high plugging and abandonment costs, which would gut the Trust's revenues and potentially lead to the Trust's dissolution in two years, the trading value of the Trust Units nosedived to $0.25 per unit by the closing.

63.     Moreover, on November 27, 2019, the NYSE informed the Trust that it was out of compliance with the NYSE's listing standards and would have six months to come within compliance, which means the Trust must achieve a unit price of $1.00 on the last day of a trading month and have a 30-day average prior to that date of $1.00 per unit.  The Trust disclosed recently that the NYSE-compliance deadline had been extended from May 18, 2020 to August 5, 2020.  However, the unit price has not reached $1.00 since November 13, 2019, and has averaged to less than $0.50 per unit during this seven-month period.

64.     On March 4, 2020, the Trust disclosed that PCEC informed the Trust that it "intended to begin deducting its estimated ARO . . . reducing the amounts payable to the Trust under its Net Profits Interest" and that PCEC's estimate of these costs was approximately $45.7 million, lower than its initial projections, but still almost as high as the Trust's total annual costs, and still without providing a basis for this estimate.  PCEC's cost estimate resulted in a "cumulative net profits deficit amount" of "approximately $25.8 million, which will be subtracted from any future net profits deficit amount until the cumulative net profits deficit . . . has been reduced to zero."  Coming at a time when oil prices were collapsing owing to the COVID-19 pandemic and global politics with oil producers, PCEC's timing for deducting these costs was especially unfortunate.

65.     In the March 4, 2020 disclosure, the Trust warned:

Based on PCEC's [cost] estimate . . . . deductions related to estimated [costs] are likely to eliminate the likelihood of significant distributions to Trust unitholders for the next several years, as previously disclosed in the Trust's Current Report on Form 8-K filed on November 13, 2019.

\*\*\*

13

[T]he Trust will terminate if the annual cash distributions received by the Trust from the Net Profits Interest and Royalty Interest total less than $2.0 million for each of any two consecutive calendar years. PCEC is deducting estimated [costs], thereby reducing the amounts payable to the Trust unless significant market changes were to occur; therefore, it appears likely that total distributions to the Trust will total less than $2.0 million for each of 2020 and 2021.

66.     Meanwhile, PCEC continues to reap $77,000 to $93,000 per month in management fees, which, together with the Trust's operating expenses and reduced profits owing to PCEC's high ARO deductions, have resulted in the Trust running a deficit for most of the time since Wood took over PCEC in September 2019. Thus, the Trust has been unable to issue distributions since then except for a token amount in January 2020. Moreover, as early as November 13, 2019, the Trust disclosed that the Trustee believes that it is unlikely to be able to issue any distributions in 2020 or 2021, and that if it is unable to do so, the Trust will dissolve under the terms of the Trust Agreement. Yet, despite understanding and disclosing the risk of dissolution, the Trustee continues to merely review PCEC's estimate and to date has not taken any action. The Trustee's lack of concrete action is even more concerning because it is aware of the looming NYSE delisting deadline, and knows that to meet the August 5, 2020 deadline, the Trust Unit price would have to recover in time to average $1.00 for a month before.

67.     Since PCEC has begun to deduct ARO yet continues to charge its full service fee each month, the Trust's financial situation has deteriorated. The Trust has been forced to draw from a $1 million credit line from PCEC to cover its costs.

68.     The Trust disclosed on May 7, 2020, that its financial situation continued to deteriorate due to PCEC's deductions for abandonment and plugging costs while still charging its full service fee. The Trust noted that approximately $751,000 remained on the $1 million line of credit from PCEC, because the Trust was once again forced to draw on it to cover its operating expenses. The Trust further disclosed, "PCEC may loan funds to the Trust necessary to pay such expenses; however, it has informed the Trustee that for the foreseeable future PCEC does not expect to loan such funds to the Trust."

69.     On June 2, 2020, the Trust disclosed that PCEC continued to collect fees while deducting for abandonment and plugging costs from the profits it was supposed to send to the Trust. Thus, the

14

1  Trust once again had a shortfall, could not distribute distributions to Trust Unitholders, and was required

2  to draw further down on its credit line, so that $648,000 remains. The Trust disclosed that once again,

3  while PCEC "may loan funds to the Trust" if the line of credit is exhausted, "PCEC has informed the

4  Trustee that for the foreseeable future PCEC does not expect to loan such funds to the Trust."

5      70.    The evidence shows that Wood directed the improper and misleading cost estimate by

6  PCEC to cement a plan to starve the Trust of cash, either to siphon the cash to himself as in what he did

7  at ERG, or so that he can purchase the Trust for himself, either due to the drastic decline in the unit

8  trading price or through a dissolution sale in two years. Wood's history at ERG demonstrates his lack of

9  respect for corporate formalities and his willingness to engage in misconduct. Evidence of Wood's

10  reputation for misconduct includes the fact that PwC resigned as auditor and expressly told the Trustee

11  its concerns were relating to the change in ownership of PCEH, *i.e.*, the fact that Wood took over.

12  Evidence that Wood has concocted this scheme includes the fact that soon after he took control of PCEC,

13  a formerly reliable stream of profits slowed or trickled to a stop, causing the Trust to be unable to issue

14  distributions. Evidence for Wood's misconduct is further bolstered by the fact that shortly after PwC

15  resigned, PCEC came up with an unsupported ARO estimate of five times its last estimate, without

16  explanation as to the change, which shocked the market and directly led to the cratering of PCEC's Trade

17  Unit prices. And shortly after Wood took control of PCEC, it began to starve the Trust of revenue so that

18  the Trust could no longer issue distributions. Furthermore, after initially disclosing its unreasonably high

19  ARO estimates in November 2019, it chose to begin to deduct those costs precisely when the oil market

20  collapsed, thus hastening the Trust's financial collapse. Meanwhile, PCEC continued to charge the same

21  service fees, thus forcing the Trust to draw down its line of credit. Finally, PCEC, under Wood's control,

22  has signaled that it will not lend the Trust further funds even though PCEC controls both the revenues

23  and the costs that the Trust incurs.

24      71.    As illustrated above, the deterioration in the Trust Unit values and the Trust's health can

25  only be attributed to PCEC's misconduct. General market conditions – even when they are turbulent –

26  cannot explain this decline. The oil that the Trust draws revenue from generally sell at the Midway

27  Sunset and Buena Vista crude oil prices (which themselves sell at a premium to West Texas Intermediate,

28  the measure most frequently used for U.S. oil price references). In a chart illustrating how the Trust Unit

traded compared to the Midwest Sunset and Buena Vista crude oil prices, the Trust Units traded in line with those prices *until* Wood took control of PCEC and caused it to engage in misconduct. Since Wood took control of PCEC, the Trust Unit trading value has declined precipitously even when the market has been stable, and the Trust Unit trading value has declined by even more than the oil market when the market is turbulent.



### C. The Trustee Negligently Conducts Slow Review and Fails to Stem the Damage

72.     From the public filings, the Trustee was on notice regarding PCEC's improper ARO accounting since November 2019. The Trustee announced in November 2019 that it would engage its own consultant to come up with its own ARO estimates. Yet, seven months later, the Trustee has not completed its review or taken any action whatsoever to protect the Trust or the Trust Unitholders.

73.     The Trustee is also aware that because of PCEC's improper actions, the Trust runs the danger of being delisted, having received a notice from the NYSE on November 27, 2019. While the timeline for compliance has been extended to August 5, 2020, the August deadline is rapidly approaching.

1  Yet, the Trustee has taken no action to mitigate Wood's misconduct, which has artificially depressed the

2  Trust Unit trading price.

3      74.    Specifically, the Trustee has not sought to enjoin Wood or PCEC from deducting its

4  inflated ARO estimates from the profits it is required to send to the Trust every month. The Trustee has

5  also not sought to enjoin PCEC from making these inflated cost estimates, despite how the overhang of

6  these estimates has depressed PCEC's Trust Unit prices. Furthermore, more than seven months after

7  PCEC's improper estimate, the Trustee is still conducting a review without giving any indication as to

8  when its review might end.

9      75.    The Trustee has also not undertaken any other actions to seek to mitigate or reverse the

10  unit price decline so that it could cause the Trust to come back into compliance with NYSE listing

11  guidelines, e.g., through repurchasing Trade Units or through engineering a reverse split of Trade Units.

12  Meanwhile, time is running out before the Trust can come back into compliance with NYSE listing

13  requirements.

14      76.    Furthermore, Plaintiff brought potential claims to the Trustee's notice on several

15  occasions: in a letter to the Trustee dated December 30, 2019; in email correspondence on February 14,

16  2020; in a telephonic conversation with the Trustee's counsel on March 2, 2020; and in a letter to the

17  Trustee's counsel on April 29, 2020. The April 29, 2020 letter emphasized the urgency of the matter,

18  given the pending delisting deadline. But the Trustee, either directly or through its counsel, has not

19  responded. Furthermore, the Trustee's public disclosures through the Trust's SEC filings, continue to

20  represent that it is continuing to review PCEC's calculations, without doing anything to mitigate the harm

21  PCEC has caused so far. Under these circumstances, the Trustee has acted grossly negligent, in violation

22  of its contractual duties under the Trust Agreement.

23              **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

24      77.    Plaintiff brings this action on behalf of a class consisting of all persons or entities that

25  have held Trust Units at any time between September 3, 2019 and July 7, 2020 (the "Class"). Excluded

26  from the Class are the Defendants: the officers, directors, affiliates, and subsidiaries of the Trustee and

27  PCEC, at all relevant times; counsel of record for all parties; any entity in which Defendants have or had

28

a controlling interest; and the legal representatives, heirs, successors, or assigns of any such excluded person or entity.

78.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the proposed Class. The members of the proposed Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using customary forms of notice that are commonly used in securities class actions.

79.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct.

80.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel who are competent and experienced in class and securities litigation.

81.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the Trustee's acts or omissions were grossly negligent, and therefore, violated the Trust Agreement, as alleged herein;

(b)     whether PCEC breached the implied covenant of good faith and fair dealing of the Trust Agreement by engaging in bad faith acts;

(c)     whether the Court can order specific performance by enjoining the Trustee and PCEC from engaging in acts that damage the Trust Unitholders; and

(d)     to what extent Plaintiff and the other members of the Class have sustained damages and the proper measure of such damages.

82.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

18

**FIRST CAUSE OF ACTION**
**Breach of Trust Agreement**
**(Against the Trustee)**

83.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

84.     Under the Trust Agreement, the Trustee is liable for "its own fraud, gross negligence or willful misconduct."

85.     The Trustee's refusal to take firm and quick action against Wood and PCEC constitutes gross negligence because a reasonable person in the Trustee's position would know that such delay would lead to damages and irreparable harm to the Trust Unitholders. First, the Trust Unitholders have not received any distributions – the primary purpose for which they invest in the Trust Units – for almost the entire nine months since PCEC was taken over by Wood. Second, PCEC's actions have led to a collapse in the Trust Unit trading price, to the point where the Trust is facing an imminent delisting from the NYSE, which will result in a liquidity crunch of Trust Unitholders. Third, the Trust has disclosed that it does not anticipate receiving enough revenue to prevent dissolution under the Trust Agreement in two years.

86.     As a result of the Trustee's gross negligence, Plaintiff and other members of the Class face irreparable harm and have and will incur damages.

**SECOND CAUSE OF ACTION**
**Breach of the Implied Covenant of Good Faith and Fair Dealing in the Trust Agreement**
**(Against PCEC)**

87.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

88.     PCEC has breached the implied covenant of good faith and fair dealing, which under the DSTA is the one contractual condition that cannot be contracted away, through its bad faith or grossly negligent actions in disclosing and deducting unsupported and misleading ARO estimates, in violation of GAAP and industry practices. By doing so, it has reduced the revenue of the Trust, and in signaling a refusal to support the Trust despite the fact that PCEC controls both the revenues and costs of the Trust.

89.     That PCEC has the duty, under the Trust Agreement, to not provide misleading projections to the Trust or to starve it of revenue in bad faith, are implied terms of the contract because counter-

19

parties would think not misleading the other party or intentionally causing it financial harm would be such obvious terms that there would be no need to express these prohibitions in the contract. "[T]he law presumes that parties never accept the risk that their counterparties will exercise their contractual discretion in bad faith." *Amirsaleh v. Bd. of Trade of City of New York, Inc.*, No. CIV.A.2822-CC, 2008 WL 4182998, at *1 (Del. Ch. Sep. 11, 2008).

90.     Through PCEC's bad faith acts in disclosing misleading ARO estimates, and in deducting these costs in the midst of the COVID-19 pandemic, and thereby starving the Trust of revenue, PCEC caused damage to the Trust Unitholders directly by preventing Trust Unitholders from receiving distributions and by causing the Trust Unit trading value to decline precipitously. Trust Unitholders also face irreparable harm from the pending delisting from the NYSE, which was proximately caused by PCEC's bad faith.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the other members of the Class, prays for judgment as follows:

A.     Declaring this action to be a proper class action and certifying Plaintiff as the Class Representative under C.C.P. §382;

B.     Awarding Plaintiff and the other members of the Class compensatory and consequential damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing in an amount to be proven at trial, including interest thereon;

C.     Enjoining the Trustee and PCEC from taking actions or omitting to take actions that violate the Trust Agreement;

D.     Awarding Plaintiff and the other members of the Class pre- and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements; and

E.     Awarding Plaintiff and the other members of the Class such other and further relief as the Court may deem just and proper.

1

## JURY TRIAL DEMANDED

2      Plaintiff hereby demands a trial by jury.

3  DATED: July 7, 2020

4                                    SCOTT+SCOTT ATTORNEYS AT LAW LLP

5                                    JOHN T. JASNOCH (281605)
                                     600 W. Broadway, Suite 3300
6                                    San Diego, CA 92101
                                     Telephone: 619-233-4565
7                                    Facsimile:  619-233-0508
                                     jjasnoch@scott-scott.com
8
                                     SCOTT+SCOTT ATTORNEYS AT LAW LLP
9                                    THOMAS L. LAUGHLIN, IV
                                     JING-LI YU
10                                   The Helmsley Building
                                     230 Park Avenue, 17th Floor
11                                   New York, NY 10169
                                     Telephone: 212-233-6444
12                                   Facsimile: 212-233-6334
                                     tlaughlin@scott-scott.com
13                                   jyu@scott-scott.com

14                                   *Counsel for Plaintiff Evergreen Capital Management
                                     LLC*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED CLASS ACTION COMPLAINT

## VERIFICATION

*Evergreen Capital Management LLC v. The Bank of New York Mellon Trust Company, N.A. as Trustee for Pacific Coast Oil Trust, et al.*

I, DAVID HAY, declare:

I am the Chief Investment Officer of Evergreen Capital Management LLC ("Evergreen"), the Plaintiff in the above-entitled matter.  I am authorized to act on behalf of Evergreen.  I have read the foregoing Class Action Complaint and know the contents thereof.

The same is true of my own knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe those to be true.

Executed on July 2nd, 2020, at Bellevue, King County, Washington.

I declare under penalty of perjury that the foregoing is true and correct.

DAVID   HAY,   on   Behalf   of   Evergreen Capital Management LLC